QUESENBERRY *versus* THE STATE.

1. The statute of 1831,[*] prescribing the mode of selecting jurors in capital cases, embraces within its provisions only the two grounds—of opinion, formed and expressed from a *knowledge of facts;* and upon *rumor.*

2. But, this statute does not embrace the whole ground of challenge, on account of pre-conceived and expressed opinion.

3. An opinion formed by a juror, upon facts not personally known, but well authenticated, by witnesses or others, in whom he placed confidence; would not be included in the term *rumor,* as used in the statute.

4. So, it is a good ground for the challenge of a juror for cause, in a criminal case, that he had formed and expressed an opinion, upon information, derived from a person in whom he had confidence—the latter having received his information from a witness.

5. On a trial for murder, evidence of the good or bad character of the deceased, is not admissible, except in cases where the killing is attended by circumstances to create a doubt of its character.

6. As, where it appears, that the slayor has been actuated, in the commission of the offence, by the principle of self-defence, or by some other fact that would excuse the offence.

7. So, the rejection of evidence of the bad character of the slain person, is not error, where the record does not show a state of facts, to warrant its admission.

Quesenberry was indicted in Jackson Circuit court, for the murder of one Lewis; and was found guilty, and condemned. In relation to questions of law, raised in the progress of the trial, the Circuit court reserved the points, as novel and difficult.

The first point raised, here, under the reservation of the presiding judge, was, as to the right of challenge to a juror.

[*]See Aikin's Digest, page 122, §50.

The record showed, that one Perkins, on having the question propounded to him, whether he had formed or expressed an opinion, as to the guilt or innocence of the prisoner, replied, that he had.— Being further interrogated, he said, that his opinion was founded upon information, derived from one in whom he placed confidence; and, who had received a statement of facts from one of the witnesses in the case. On a challenge being proffered to this juror, the court determined, that it was no ground of challenge, for cause.

A second question presented for the determination of this court, was one arising on the rejection of evidence of the bad character of Lewis—testimony going to prove which was offered by the prisoner.— It did not appear from the record that any testimony was before the court on this point, except as to the abstract question of the general character of Lewis; or that any facts were proved which rendered the character of the homicide doubtful. Whether it were murder, manslaughter, or homicide, *se defendendo.*

*Thornton* and *Fletcher*, for the prisoner—*the Attorney General, contra.*

LIPSCOMB, C. J.—This case comes up on points reserved for our consideration, by the presiding judge of the Jackson Circuit court, before whom the prisoner was tried, for the murder of Tandy W. Lewis, and convicted.

The points reserved will better appear by a reference to the following statement, signed and sealed by the judge, as a bill of exceptions:

"Be it remembered, that in the trial of this cause, Jabez. Perkins was offered as a juror, and having been first sworn to answer questions, &c. the question was propounded to this effect, 'have you formed and expressed an opinion as to the guilt or innocence of the prisoner at the bar?' Said Perkins replied, that he had so formed and expressed an opinion. To the question whether he formed and expressed said opinion, on hearing the evidence in relation to said charge, or upon his own knowledge of the facts, or upon rumor? said Perkins answered, that he had so formed and expressed said opinion, on hearing the facts stated, by a man in whose veracity he had implicit confidence; which man said he had received his information from one of the witnesses: thereupon the defendant, by his counsel, objected to the competency of said juror, and challenged him for cause; but the court overruled said objection, and determined said juror to be competent, and required said defendant to accept said juror, or challenge said juror peremptorily, or for other cause; upon which the prisoner challenged said juror peremptorily, at the same time demanding, that said point should be reserved; and the number of challenges allowed by law, were exhausted, before said jury was complete, and the said defendant compelled to accept two jurors, without the right of peremptory challenge. But the said number of peremptory challenges was not exhausted at the time said Perkins was determined, by the court, to be competent.

"And in the further progress of said cause, said defendant offered evidence to prove the general character of said Tandy W. Lewis, deceased, with whose murder the defendant is charged; for acts of general

violence and outrage. There having been no proof, or allegation, of acts of violence or outrage, or threats, by said Lewis, towards said prisoner, previous to the occasion of his death ; which evidence having been objected to by the solicitor, Charles Lewis, Esq., the court sustained the objection and excluded the evidence. To which last opinion of the court, the defendant also excepted."

Two points were reserved for the opinion of this court, as novel and difficult:

First—Whether the juror, Perkins, was competent? and

Second—Whether the testimony was properly rejected?

Before we say any thing about the common law right of challenging a juror, on what was considered a good ground for challenge, it will be proper, perhaps, to inquire what is the true construction of our act of assembly, "the more effectually to secure trials in capital cases by impartial jurors;" as this act, in all probability, influenced the presiding judge, on the first point reserved : and, for the purpose of more easy reference, we will here recite so much of the statute as can be, in any way, material to be considered :

"Be it enacted, that, in the selection of a jury, for the trial of a person charged with the commission of a capital crime, it shall be the duty of the court, after the juror is sworn, to make true answer to such questions as may be damanded of him, by the court, to ask the juror, if he has formed and expressed an opinion, as to the guilt or innocence of the prisoner at the bar. If the juror answers that he has formed and expressed an opinion, then the court shall de-

CASES DETERMINED

mand of him whether the opinion he has so formed and expressed, is formed upon his own knowledge of the facts, or upon rumor. If he answer that the opinion so formed and expressed, is formed upon his own knowledge of the facts, then he shall be rejected; but if he answer that his opinion, so formed and expressed is formed upon rumor, then he shall be sworn in chief, unless challenged by the prisoner, or prosecuting officer."

Whatever may have been the object of this act of our assembly, it seems to me that it can, in no way, operate on more than two grounds of a formed and expressed opinion. The first is, where it is from the juror's own knowledge, and this is sufficient to disqualify him from serving as a juror. The second is, where it is derived from rumor. If there is a foundation less certain than the juror's own personal knowledge, but more certain, and more to be relied on than mere *rumor*, it would be an intermediate ground, not embraced by the act of assembly. We can not believe that the legislature intended that these two classes, opinions formed on personal knowledge, and opinions formed on rumor, should cover the whole ground of challenge, on the ground of a preconceived and expressed opinion. It could not have been intended, that an opinion formed on facts, not personally known to the juror, but so well authenticated, that in the ordinary transactions of mankind, would govern their minds on the subject, should be embraced by the term, rumor. To use the term rumor in such a sense, would be giving form and substance to a shadow, and would be assuming an interpretation never claimed for it by the most approved Lexicographers and standard writers in our language. It

would be no longer a "pipe blown by surmises, jeal·
ousies, conjectures;" it would flow in a more palpa-
ble and tangible stream.    Mr. Webster, in his valu-
able Dictionary, defines rumor to be "a flying or pop-
ular report, a current story, passing from one to an-
other, without any known authority for the truth of
it."    If this is the true definition of rumor, there
must be many grades between it and the truth, from
a personal knowledge of the facts.    And it would
seem, that a true construction of our statute would
not embrace those intermediate grades; and their suf-
ficiency, as a ground of challenge, would remain to
be tested by the principles and practice of the com-
mon law.    In taking leave of the act of the legisla-
ture, supposed to have influenced the decision of the
presiding judge, in the court below, I will further
remark, that it does not seem to me to have made the
slightest innovation on the common law practice, as
adopted by this court, in the case of *The State* vs.
*Coleman Willivms*, decided prior to the enactment of
the law.    The grounds declared by the statute, to be
insufficient for a challenge, for cause, were ruled, in
that case, to be insufficient, and the same ground rul-
ed to be a good ground for challenge—is so or-
dained by the act of the legislature.    The enactment
could only satisfy the doubts of some who were not
satisfied with the opinion of the court; and this
is the only beneficial influence that can result from it.

We will now inquire, whether the foundation, on
which Perkins had formed and expressed an opi-
nion, was based on any thing less certain than perso-
nal knowledge, and yet more certain than rumor.—
In his answer to the interrogatory propounded, he
says, that he derived his information from "a man,

in whose veracity he had implicit confidence, who said that he had received his information from one of the witnesses." The channel through which the information came to the juror, is here given, and is much more certain than the definition before given, of the idle, vagrant rumors. But it was not as certain as his personal knowledge would have been. The source of the information is, therefore, intermediate; and it will only remain for us, on this point, to inquire, if it constituted a sufficient ground of challenge. The doctrine on this subject is fully discussed, and the rule clearly laid down in the opinion of this court, in the case of *The State* vs. *Coleman Williams.* In that case, the rule said to have been declared by Judge *Spencer*, on the trial of Van Alston, for the murder of Huddleston, is fully recognised : " That, if a person had formed or expressed an opinion, for or against the prisoner, on a 'knowledge of any of the facts attending the murder, or from information of those acquainted with the facts, he considered it good cause of challenge."

In this case, although the juror, Perkins, professed to have no personal knowledge of the facts, his opinion was founded, upon what he considered, an authentic source, and the impression was as strong as 'if he had heard it himself, from the witness. Not a link is wanting in the chain of communication, from the witness to the juror: it was told by the witness to a person in whose veracity, confidence was reposed, who communicated it to the juror. This seems to me, to be a case within the rule laid down by Judge *Spencer*, and recognised by this court.

I have not referred to authorities, because the question underwent so full an investigation in this

court, in the case referred to, that to repeat the conclusions drawn from authorities, then examinined, would be an unnecessary labor, that could shed no new light upon the subject.

The second point reserved for the opinion of this court, is, on the admissibility of the testimony offered by the prisoner, and rejected by the court.

The circumstances, under which this testimony was offered, are not shown, by the record, with sufficient clearness, and distinctness, to enable this court to determine, whether it ought to have been admitted, or not. That the good or bad character of the deceased, as an abstract proposition, can have no influence on the guilt of the accused, is too clear to admit of controversy. To murder the vilest and most profligate of the human race, is as much a crime, as if he had been the best, the most virtuous, and the greatest benefactor of mankind. But, there can be no doubt, but that, when the killing has been under such circumstances, as to create a doubt as to the character of the offence committed, that the general character of the accused, may sometimes afford a clue, by which the devious ways, by which human action is influenced, may be threaded, and the truth attained. It is an acknowledged principle, that, if, at the time the deadly blow was inflicted, the person who so inflicts, has well founded reasons to believe himself in imminent peril, without having, by his fault, produced the exigency, that such killing will not be murder.

If the deceased was known to be quick, and deadly, in his revenge of imagined insults—that he was ready to raise a deadly weapon, on every slight provocation; or, in the language of the counsel, his

"garments were stained with many murders"—when the slayor had been menaced, by such an one, he would find some excuse, in one of the strongest impulses of our nature, in anticipating the purposes of his antagonist. The language of the law, in such a case, would be, obey that impulse, to self-preservation, even at the hazard of the life of your adversary.

If the killing took place, under circumstances, that could afford the slayor no reasonable grounds, to believe himself in peril, he could derive no advantage, from the general character of the deceased, for turbulence and revenge. But, if the circumstances of the killing were such, as to leave any doubt whether he had not been more actuated by the principle of self-preservation, than that of malice, it would be proper, to admit any testimony, calculated to illustrate to the jury, the motive by which he had been actuated.

To this course, we can see no good objection ; and, it seems pretty certain, that it would often shelter the innocent from the influence of that sound, but not unfrequently severe, maxim of law, that, when the killing has been proven, malice will be presumed, unless explained and rebutted. There can be but little danger of the guilty escaping, under the influence of a prejudice, created by such testimony, against the deceased. The discretion of the judge will be able to control and prevent such a result.—And jurors will be able to comprehend the reason and object of such testimony.

As I before remarked, it does not appear, from the record, with sufficient clearness, under what circumstances, this testimony was rejected, to authorise us

to say, that it was improperly rejected. We do not know, that the views we have expressed, were departed from, and we would hesitate, to reverse the judgment on this ground. But, the judgment must be reversed on the first point, reserved for our consideration; and remanded for a new trial.—And this is the opinion of the court.