## WESLEY (A SLAVE) v. STATE, 37 Miss. R., 327.

### HOMICIDE.

On the trial of an indictment for homicide, evidence to prove that the deceased was well known and understood, as well by the accused as others, to be a quarrelsome, vindictive, and dangerous man, is inadmissible. Wharton's Am. Cr. L., 235.

When it is shown that the accused had reasonable grounds to apprehend immediate danger to his life from the deceased, the character of the deceased, in connection with previous threats, may be given in evidence as explanatory of the motives upon the defendant's action. Ib.

To make a homicide justifiable on the ground of self-defense, the danger must be either actual, present, and urgent, or the homicide must be committed under such circumstances as will afford reasonable ground to the party charged to apprehend a design to commit a felony, or do him some great bodily harm, and that there is imminent danger of such design being accomplished. Rev. Code, 601, § 34.

A homicide, where the party killing is in no danger, actual or real, and has no reason to apprehend danger, is murder.

It is the province and exclusive right of the jury to weigh the evidence, and to determine the facts of the case submitted to their consideration. Hence, it is error for the court to instruct the jury as to the weight of the evidence before them, or to charge that any fact material to the issue was proved. But if it is shown that the prisoner was not injured by the giving of such instructions, the error will not be corrected.

The good character of the accused, when satisfactorily established by competent witnesses, is an ingredient which ought always to be submitted to the jury with the other facts of the case. 2 Russ. Cr., 785; Wharton's Cr. L., 285. But it is insufficient to raise a reasonable doubt in the minds of the jury, when, excluding such proof, the evidence is sufficient to satisfy them of the guilt of the accused.

Error to Monroe circuit court.    ACKER, J.

The prisoner was indicted for the murder of William G. Ford. He pleaded not guilty to the indictment, and the case was submitted to the jury.

The substance of the testimony adduced on the trial is as follows :

The deceased had been overseeing for Walker, the owner of the prisoner, for about one month previous to his death; that about sunrise on Sunday morning, the 1st of August, 1858, the deceased brought the prisoner to the door of the smoke-house, and called for the key, and for a strap with which he usually tied negroes. These were brought to him. He then tied the prisoner and put him in the smoke-house, and locked the door,

and then went into the dwelling-house. He did not appear angry or excited. In a very short time, not exceeding five minutes, deceased's wife wanted to get out some meat for breakfast, and asked deceased to go with her into the smoke-house, which he did. While she was whetting a knife at the corner of the smoke-house, and about six yards from the door, deceased opened the door, and as it opened there was a noise, and deceased was heard by his wife to fall over some cotton-baskets that were near the door. The prisoner sprang so rapidly past from the smoke-house, that the wife of the deceased was unable to identify him. He immediately ran off. Deceased commenced struggling, and his wife ran to him and called for help. She told some of the negroes to go for a doctor, but they said they did not know where the doctor lived. She then sent her son for the doctor. Deceased was then assisted into the house. He had a very bad wound on the right side of the head, and died that day about one o'clock.

The prisoner, immediately after he inflicted the blow, ran to his owner's house, about a half-a-mile distant, and not finding his owner home, left, and soon afterwards, being hunted with dogs, he went again to his master's house. The wound inflicted was proven to be a fracture of the skull, and it appeared to be made by a stick, or some such instrument. There was some doubt as to whether the wound was inflicted by a hexagonal piece of timber, of sufficient size, in the language of one of the witnesses, "to knock a bull down with," or a paddle some three feet long and of sufficient thickness to inflict death, or a brick-bat. The prisoner, soon after his arrest, stated that he did not know with what instrument he struck the blow, but thought it was a piece of timber "like a hoe-helve."

It was in proof for the defense, by three slaves, that just immediately preceding the carrying of the prisoner to the smoke-house, the deceased had conceived that the prisoner had not executed properly a command to curry a mule, and had become very much enraged, and had beaten with his fist, and had kicked the prisoner with great violence, and on starting to the house with him, told the prisoner, "that he would know how to curry a mule when he had done with him."

The prisoner was proven to have been an obedient and submissive slave. The general character of the deceased was also in evidence. He was proven to be cruel and violent in his treatment of slaves; and had been discharged by one employer for cruelty to his slaves, which was rejected by the court, to which the prisoner excepted.

The prisoner was convicted, and upon his motion for a new trial being overruled, he sued out this writ of error.

The opinion of the court recites the instructions given and refused, to which exceptions were taken.

*Sale & Phelan,* for the plaintiff in error.

1. That a knowledge of the violent and dangerous character may be adduced in behalf of a white man, needs no authority. It is one of the most important features in determining the degree of apprehension which the prisoner may reasonably have entertained; and the same rule applies in the case of a negro. Every fact and circumstance in the assault of a white man upon a negro must inevitably awaken and keep in alarm his fears as to what the unresisted violence of the white man will wreak upon him. As his hope lessens, his fear increases. He knows he must yield to great personal suffering ere he do aught but supplicate. He feels that, at some point he may strike to save life or limb, and when submission has been yielded, and the suffering endured, and he sees the "end is not yet," but that the violence increases, and threats and preparations for deadlier assaults are made about him, a sense of danger seizes on his soul; his fear, till that time repressed by the hope of cessation, now fills his mind with dread imaginings of the evils to come; and he is then infinitely less able, rationally to calculate the degree of danger which threatens him, than the white man, under circumstances of similar or even much greater hazard. Escape and life are the resistless motives which nerve his action, and he wildly, madly struggles for refuge and safety, whether angels or devils oppose, under the mere instinct of the frightened brute fettered in the toils. The testimony shows, up to the time of his being tied and locked up, a silent submission to, and endurance of, both authority

and suffering, even beyond what humanity permitted, had punishment been deserved. But the prisoner appears to have done nothing, either "worthy of stripes," or that, by possibility, could have disturbed the glaring demon that seems to have tormented the deceased. From that point, therefore, the prisoner's fears, as to what was to befall him, rose dominant in his heart; and, in determining the degree of criminality attached to his subsequent conduct, no more reasonable ground could exist for believing that he was in danger of loss of life or limb, than a knowledge of the "violence and cruelty" of the man by whom he was then threatened, "in his management" of his fellow slaves on his master's plantation. If the slave can allege apprehended danger, every cause of apprehension incident to the white man applies to the negro. It is a principle involved in the constitution of the human mind, and uniform in its development and operation among all races.

It could have been proved, as against the prisoner, that the deceased was a man of mild, kind, and gentle disposition and conduct, in his general management of that plantation, because from such a man the prisoner could be presumed to have had a reasonable fear of his life or limb under the facts of the case. The expression implies that, with such knowledge in his bosom, he would have been presumed and required to have blended that, as a fact, in his reasoning as to what was the danger that he must repel. If so, surely he may be permitted to prove the reverse, for the purpose of drawing a reverse conclusion. Suppose it could have been proved that it was the "general" rule of the overseer, whenever he bound a negro, locked him up, and went off, shortly to return and cut his throat! Can it be said that a knowledge of the "general" management on the plantation where the prisoner lived would have been irrelevant to the issue? The testimony should have been admitted. The error was not cured by admitting testimony of the "general character of the deceased as an overseer." The prisoner may never have heard of his "general character as an overseer." He may even have heard that the deceased was a kind man. But this could not affect what he saw and knew, in his special conduct on that special plantation. If the knowledge of the general character

of the deceased is permitted to affect the criminality of the prisoner, a confirmation of that character, from the direct evidence of his senses.

2. The giving of the sixth charge for the state, by the court below, was error, because it assumes that the killing was from mere fear, and yet denies justification. Where a party kills another through mere fear, he is justified; and when this fact appears, nothing farther can be examined. The principle is without qualification. The mind of the prisoner is the test of his guilt. If his state of mind when he did the killing was not wicked, but filled by a passion or sentiment consistent with kindness and peace, but one incited to self-preservation, and under its prompting he kills, to punish him would be to punish one whose mind was guiltless. This will not be done, unless the organization for human protection demands it. Mere fear, the veriest coward, cannot be held as a crime. To do so, is to hold the great Maker responsible. To hold a man punishable for the legitimate results of a nature which God has given him, is to say that God has made a class of men whom other men decide are not worthy to live. Man shall not take away the life of his fellow-man. If he do so with an evil heart, he may rightfully be punished. If he did not kill him from a bad heart, the inquiry stops at once, in deciding upon the question of his punishment. It is not material to show under what motive, passion, impulse, or sentiment, he did the killing. The instruction denies this principle; it permits the jury to find that the prisoner did the killing through fear of his life, and does not stop the examination there, but directs their attention to other facts or subjects as necessary to complete the prisoner's defense. We contend that if the jury believed that the prisoner believed that his life was in danger, and killed from mere fear, he is justifiable.

In such a case, in deciding in reference to the presence of apparent danger, they can only look to what was the mind of the prisoner. Not what abstract reasoning upon what the facts would suggest; not what, under the facts, they believe he would have thought; not what they think the prisoner ought to have thought; but what they believe the prisoner thought at the time. This is the test which alone gets to the proper standard

in weighing his guilt. If a party had shown sufficient grounds upon which the jury would have decided, under the action of their own minds, reasonable cause of apprehension, but in getting to the state of the prisoner's mind, they believe that he did not entertain nor act upon that apprehension, they would justly convict him, because his mind is the test of his conduct. If, on the other hand, judging by their own minds, they believe that reasonable grounds did not exist for apprehension, but in getting back to the prisoner's mind, they believe that he did so think, and merely acted upon that thought, they should acquit him. Why should the actual state of mind of the prisoner, against the reasoning of the jury, convict in the one case, and not acquit in the other? If, therefore, the rule is, that a killing from fear of life is justifiable under apparent danger, and the presence or not of this supposed danger is to be tested by the belief of the prisoner at the time, then an admission that he killed from fear of life involves the farther admission that he believed the danger was present. It is impossible to conceive an admission that a party killed from fear, and a denial that he entertained apprehension. Such a paradox is an impossibility under the constitution of the human mind. They are inseparable.

The principle, therefore, is the same, with or without the addition, "if danger is apparent." The jury would have only to find the same fact under either, that the prisoner did kill through fear of his life, at the time. In finding that, *it* includes the presence of supposed danger to his mind.

The charge, therefore, as given, even admitting the principle correctly stated, as far as it goes, was not sufficiently definite, and was calculated to mislead the jury, in not declaring that, in deciding upon the presence of danger, they were to be governed by what they believed was the belief of the prisoner.

3. The giving of the 14th instruction for the state was error, because it assumes as proved, the most important fact in the case. This charge assumes that the prisoner did strike the blow, and also that he was then attempting to effect his escape. A court cannot assume the proof of a fact, and then charge that they constitute a crime. There is nothing hypothetical in

this charge as to the existence of the facts stated. 36 Miss., 165.

4. The refusal of the 4th charge asked for by the defendant was error. It has been usual to treat the good character of the party accused as evidence to be taken into consideration only in doubtful cases. Juries have generally been told that where the facts proved are such as to satisfy their minds of the guilt of the party, character, however excellent, is no subject for their consideration; "but when they entertain doubt," &c., "they may turn their attention to character. It is, however, submitted, with deference, that the good character of the party accused, satisfactorily established, is an ingredient which ought always to be submitted to the consideration of the jury, with the other facts and circumstances of the case." 2 Russ. Cr. Law, 704.

"According to the language frequently adopted by judges in their charges, it may be proved that character is, in no case, of any value. They say that, in a clear case, character has no weight; but if the case be doubtful, then the jury ought to throw the weight of the prisoner's character into the scale, and allow it to turn the balance in his favor. But the same judges will tell juries 'that in every doubtful case, they must acquit.' In clear cases, therefore, character is of no avail; and in doubtful cases, it is not wanted. * * * * * The sophism lies in the absolute division of cases into clear and doubtful, without considering character as an ingredient which may render that doubtful which would otherwise be clear. There may be cases where no character could make them doubtful. There may be others, in which evidence given against a prisoner, without character, would amount to a conviction, in which a high character would produce a reasonable doubt; nay, in which character will actually outweigh evidence which might otherwise appear conclusive. It is, in truth, a fact varying greatly in its own intrinsic value, according to its nature; varying still more in its relative value, according to the proofs to which it is opposed, but always a fact, like other facts proven in a cause, to be weighed and estimated by the jury." Wharton Am. Cr. Law, 235. The character of the accused is as much a fact for

the consideration of the jury as any other fact in issue. 31 Miss., 511.

*T. J. Wharton*, attorney general.

1. The proof offered of the general management of deceased on the plantation, with reference to his cruelty towards the slaves, &c., was properly excluded. On the trial of an indictment for homicide, evidence to prove that the deceased was well known, and understood generally by the accused and others to be a quarelsome, riotous, and savage man, is inadmissible. In the eye of the law, to murder the vilest and most abject of the human race is as great a crime as to murder its greatest benefactor. Wharton Am. Cr. Law, 234; State v. Field, 14 Maine R., 248; State v. York, 9 Metc., 110; State v. Hawley, 4 Harrington, 562; Queensbury v. State, 3 Stew. & P., 308. "It was not competent for the prisoner to offer evidence of the general temper and deportment of the deceased towards his overseers and tenants." * * * * * "The defendant may prove that he was acting in self-defense, and he may exhibit whatever provocation was given to him by the deceased, but he cannot set up the general reputation as a defense." State v. Tilly, 3 Ired., 424.

Even where it is the general character of the accused which is put in evidence (which can only be done by himself), it was for a long time held that it was only in doubtful cases, and cases of circumstantial evidence, that such testimony was admissible. "Such evidence ought never to have any weight, except in a doubtful case." 1 Starkie Ev., 35. "Where the testimony is positive and satisfactory to the jury, such evidence cannot avail. U. S. v. Freeman, 4 Mason, 510; Commonwealth v. Hardy, 2 Mass., 317; People v. Vane, 12 Wend., 82.

The exclusion of evidence of "specific acts of unmerciful severity (not to defendant), during the time he was on said plantation," was proper. To afford the least ground for the introduction of this evidence as part of the *res gestæ* (and it would only be under the idea that they were a part of the *res gestæ* that a court would tolerate argument on the point), the acts of

cruelty must have been done to the defendant, and not to other slaves on the plantation.

Says a learned author on evidence: "The issue is, whether defendant was guilty of the particular offense; and he advances to meet this issue with a presumption of general good character, which nothing but his own election can defeat. No matter what independent crime he may have been guilty of, or what infamy he has incurred, unless he invites the investigation himself, neither crime nor infamy can be suggested against him; and it is the pride of English and American jurisprudence that the rebuke which drove Jeffries to suicide, and Wright to jail, is still waiting for any prosecuting officer who uses his official station to procure a conviction in advance, by appeal to bad character or past offenses."

Peaceableness, or regularity of conduct and good feeling to the deceased, would, therefore, be the proper points of defense. The defendant is restricted to general evidence, it being reserved to the prosecution to put in evidence particular acts, where defendant opens the way by putting general character in issue. Wharton on Homicide, 244. Proof of *particular* transactions in which the defendant may have been concerned, is not admissible as evidence of his general good character. 1 Phill. Ev. (4th Am. ed. from 10th Eng. ed.), 764.

2. Where a slave kills his overseer, a more restrictive rule applies than in general cases of homicide. In the infliction of legal chastisement, the law will not permit the slave to resist. It is his duty to submit, or flee, or seek the protection of his master. State v. Jarrett, 1 Ired., 86; Jacob v. State, 3 Humph., 519; State v. Will, 1 Dev. & Bat., 163.

It exists in the very nature of slavery that the relation between a white man and his slave is different from that between free persons; and, therefore, many acts will extenuate the homicide of a slave which would not constitute a legal provocation if done by a white person. State v. Tackett, 1 Hawks, 210; State v. Cæsar, 9 Ired., 391.

There is no analogy to be drawn between cases where a free person is on trial for murder, and a slave for killing his master or overseer. 4 Jones (N. C.), 354.

3. The charge that, "If a party, through mere fear that his life is in danger, when there is no danger, either apparent or real, kill a party, such killing is not justifiable," is undoubtedly correct.

Nothing but actual, impending, and unavoidable danger to life can excuse a killing by the slave in such case. He takes the risk, when he slays his owner or overseer, of affirmatively establishing, by proof, the existence of such danger. Price's case, 36 Miss. R., 531.

"Who is to judge of the reasonable ground to apprehend a design to do injury? The grounds must be made to appear on the trial; and the jury must be satisfied that they were reasonable grounds upon which to found the apprehension of design to commit the felony, or to do some great personal injury. It is true the party assailed must at the time judge of the ground for his apprehension, but he judges and decides at his peril, so far as the question of entire justification is concerned." Wharton Am. Cr. Law, 392, note a.

The proof of express malice, under our law, is dispensed with. Rev. Code, 248, art. 59. The statute in reference to justifiable homicide does not apply to this case. Rev. Code, 601, art. 168.

4. The giving of the 14th instruction was correct. The instruction does not, as argued by plaintiff in error, assume as proved, facts which are not proved.

5. The modification of the 4th instruction by the court for the defendant was necessary properly to explain the rule of law, which was too broadly stated in the instruction as asked. Besides, said instructions, as refused, undertakes to decide for the jury the weight that should be given to the good character of the accused. In effect, it tells the jury that, in a certain contingency, that proof of itself was sufficient to raise a reasonable doubt of his guilt.

SMITH, C. J.:

The plaintiff in error was indicted and tried for the murder of one William G. Ford, and convicted. A motion was made in the court below to set aside the verdict, and for a new trial, which was overruled; whereupon the defendant excepted, and

has brought the cause before us by writ of error. The bill of exceptions taken to the judgment on the motion for a new trial, contains the evidence in the cause, and presents the grounds of error relied on for a reversal of the judgment.

A detailed statement of the evidence is unnecessary, as it will be quite sufficient to refer to only such parts of it as may be requisite to a proper comprehension of the questions raised by the assignment of errors, and discussed by counsel.

1. The first exception relates to the exclusion of certain evidence offered by the prisoner.

The deceased was, at the time of the alleged homicide, the overseer of one John A. Walker, and as such had under his control and management the accused, who was a slave, and the property of the said Walker. The commission of the homicide by the prisoner, and the facts and circumstances immediately attending the perpetration of the deed, are distinctly proved. The testimony of Mrs. Ford, the only witness, as it appears from the record, who was present at the killing, shows very clearly that the prisoner, when he slew the deceased, was in no present danger, either real or apparent, and that there was not reasonable ground to apprehend that the deceased meditated taking the life of the accused, or designed to do him some great bodily harm, and there was imminent danger of such design being accomplished.

On this state of evidence, the prisoner offered to prove the general management of the deceased on the plantation where he was the overseer, "with reference to violence and cruelty;" and (also) to prove "specific acts of unmerciful severity" committed by him while acting as such overseer, which had come to the knowledge of the witness subsequently to the killing. This evidence was excluded, and the prisoner excepted.

And this ruling of the court is assigned for error.

In the estimation of the law, to murder the most wicked is as great a crime as to murder the best and most innocent of the human species. Hence, as a general rule, it is held by all the courts that on the trial of an indictment for homicide, evidence to prove that the deceased was well known and understood, as well by the accused as others, to be a quarrelsome, vindictive,

and dangerous man, is inadmissible. When, however, the character of the deceased is involved in the *res gestæ*, evidence in regard to it may be introduced. As, when it is shown, that the accused had reasonable ground to apprehend immediate danger to his life from the deceased, the character of the deceased, in connection with previous threats, &c., may be given in evidence as explanatory of the motives upon the defendant's action.[1]   Am. C. L., 235.

The courts in North Carolina, in Alabama, and Tennessee, while acknowledging the general doctrine, as above stated, have gone a step farther, and hold that where the homicide has been committed under such circumstances as to create a doubt as to the character of the offense, the general character of the deceased may sometimes be given in evidence. The State v. Tackett, 1 Hawks, 210; Wright v. The State, 9 Yerger, 342; Queensbury v. The State, 3 Stewart & P., 315. As in the case last cited, where it was held that "if the circumstances of the killing were such as to leave any doubt whether the defendant had not been more actuated by the principle of self-defense than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motive by which he had been actuated."

The principle here recognized is in conflict with the generally received doctrine on the subject, which, as we have seen, excludes evidence in regard to the general character of the deceased, except when it is involved in the *res gestæ*. But without asserting that extreme cases might not be presented, in which evidence of the general vindictive, revengeful, and dangerous character of the party slain, might properly be allowed to go to the jury as explanatory of the state of defense in which the defendant placed himself, although not strictly a

[1] Wharton's Am. Cr. Law, 641; Wharton on Homicide, 1215–1220; Pritchett v. State, 22 Ala., 39; Queensbury v. State, 3 Stew. & P., 315; State v. Tackett, 1 Hawks, 210; Wright v. State, 9 Yerg., 342; Hinch v. State, 25 Ga., 699; Dupree v. State, 33 Ala., 380; State v. Hicks, 6 Jones (Mo.), 588; Payne v. Com., 1 Metc. (Ky.), 370; De Forest v. State, 21 Ind., 23; State v. Smith, 2 Head, 748; Franklin v. State, 29 Ala., 14; Cotton v. State, 31 Miss., 504; Com. v. Seibert, ——; Com. v. Wilson, 1 Gray, 337; Monroe v. State, 5 Geo., 85; People v. Shorter, 4 Barb., 460; 2 Comstock, 197; Campbell v. People, 16 Ills., 17; Schier v. People, 23 ib., 17; State v. Jackson, 12 La. Ann,. 679; State v. Hawley, 4 Harring., 452; Patterson v. People, 46 Barb., 625; Wharton's Am. Cr. Law, 1026–7.

part of the *res gestæ*, if the question here presented were tested by the doctrine laid down in the cases cited, it seems clear that the court did not err in ruling out the evidence. For here there is no pretense for the assumption that the homicide was committed under such circumstances as to create a doubt as to the character of the offense; and it is clear that the reasons upon which the rule in reference to the admissibility of evidence as to the general character of the deceased is founded, apply with greater force where it is sought to introduce evidence in regard to specific acts of the deceased, or to prove the general tenor of his conduct for a specified time, and in relation to particular subjects.

But the real question involved in the exception is not, whether, in prosecution for murder, it is competent, under any circumstances, for the defendant to prove the general revengeful and dangerous character of the deceased. It is, whether the general management of slaves on a plantation, by the deceased, was characterized by violence and cruelty, and whether specific acts of severity and cruelty committed by him, while acting in the capacity of an overseer, may be proved as circumstances going to justify a homicide by a slave, committed upon him while acting as such overseer.

Whether considered abstractly, or in reference to the facts immediately connected with the killing in this case, it is manifest that the validity of this position rests upon the doctrine, not heretofore announced in this court, that in an indictment for a homicide committed by a slave upon his master or overseer, the violent and cruel character of the overseer or master, in the government of his slaves, and specific acts of severity and cruelty committed by such overseer or master, may be considered by the jury, in determining the guilt or innocence of the accused, although the killing may be proved to have occurred under circumstances which show that the party charged was, at the time, in no present danger, real or apparent, and that he had no reasonable ground for apprehending danger to life or limb from the deceased, or that the deceased designed to take his life, or do him some great bodily harm, and there was imminent danger of such design being accomplished. In other words, that

a slave, charged with the murder of his master or overseer, may excuse or justify the deed upon the ground that, being about to be chastised by his master or overseer, or being apprehensive that he would be punished for some real or imputed delinquency, from the known violent and cruel character of the deceased in the management of slaves, and from the fact that he had been guilty of particular acts of great cruelty upon other slaves under his charge, he had good reason to apprehend, and, in fact, did believe, that some great bodily harm would be inflicted upon him, or that his life would be taken.

It is scarcely necessary to say that this proposition is utterly untenable. It lays down a rule which, if recognized by the courts, would produce the most disastrous consequences. If the slave, when he is about to be chastised, or has just reason to apprehend that he will be subjected to cruel and unmerited punishment, be informed that, in order to escape, he may innocently slay his master or overseer, if he really believes that, by the apprehended punishment, his own life will be taken or greatly endangered; and that, to make good his defense in a court of justice, it will be sufficient to prove the general violent and cruel conduct of the deceased in the government of slaves, the slave population of the state will be incited to insubordination and murder, and the life of the master exposed to destruction, either through the fears or by the malice of his slaves.

But the principle contained in the proposition, when applied to homicides committed by white persons, is equally untenable.

To make a homicide justifiable on the ground of self-defense, the danger must be committed under such circumstances as will afford reasonable ground to the party charged to apprehend a design to commit a felony, or to do him some great bodily harm, and that there is imminent danger of such design being accomplished. Rev. Code, 601, § 34. Hence the mere fear, apprehension, or belief, however sincerely entertained by one man that another designs to take his life, will not excuse or justify the killing of the latter by the former. Where the danger is neither real nor urgent, to render a homicide excusable or justifiable within the meaning of the law, there must, at the least, be some attempt to execute the apprehended design, or there

must be reasonable ground for the apprehension that such design will be executed, and the danger of its accomplishment imminent. State v. Scott, 4 Iredell, 409. A party may have a lively apprehension that his life is in danger, and believe that the ground of his apprehension is just and reasonable; but if he act upon them, and take the life of a human being, he does so at his peril. He is not the final judge, whatever his apprehension or belief may have been of the reasonableness of the grounds upon which he acted. That is a question which the jury alone are to determine.

2. The next objection applies to the sixth charge granted in behalf of the state. The charge is in these words: " If a party, through mere fear of his life, there being no real or apparent danger, kill another, it is not justifiable."

In the argument of the exception to this instruction, it was contended, first, that the charge was erroneous, because it admits or assumes that the homicide in question was, in point of fact, committed through mere fear; and, second, because it denies that a killing through mere fear is justifiable.

If counsel are correct in their construction of the charge, it is certainly erroneous, but not for the reason assigned.

It would have been error if the court had said to the jury, the prisoner on trial committed the alleged offense through fear of his life; but a killing from mere fear, where the party killing is in no danger, either real or apparent, is murder; in other words, a homicide where the party killing is in no danger, actual or real, and has no reason to apprehend danger, is murder. An instruction bearing such a construction would be something more than a charge upon the weight of evidence. It would, in effect, be a command to the jury to convict the prisoner.

Such, however, is certainly not the proper construction of the charge. It lays down a principle of law for the guidance of the jury in the most abstract form, leaving them perfectly free to weigh the evidence, and to determine whether or not the homicide was committed through mere fear of life. There is, hence, no objection to the charge, unless the position be tenable that a killing through fear or apprehension that the party's life is in danger, where, in point of fact, there was no real or actual danger, and no reason to apprehend any, is justifiable.

What we have said in reference to the first assignment of errors is a sufficient answer to this objection.

3. The next error assigned is, that the court erred in giving the 14th instruction requested by the district attorney, which is in these words: "That whether the defendant, at the time he struck the blow, intended to kill the deceased, or only intended to knock him down to effect his escape, in either case he is guilty of murder, if he used such means as were calculated to endanger the life of the deceased, or to do him some great bodily injury."

The objection to this instruction is, that it assumes as proved an important fact in the case, and hence is a charge upon the weight of evidence.

It is the peculiar province and exclusive right of the jury to weigh the evidence and to determine the facts of a case submitted to their consideration. And the law is careful to guard against any invasion of their authority by the court. It is hence error for the court to instruct the jury as to the weight of the evidence before them, or to charge that any fact material to the issue was proved. For the same reason, it is improper for the court to assume as proved any fact involved in the issue, and make such assumption the basis of an instruction; for such an act would, in effect, be a charge upon the weight of evidence. But it is not for every error committed by the circuit courts, in charging, or in refusing to charge, the jury, that this court will reverse. It is only after an examination of the whole record, and when it appears that the party complaining has either been injured, or may have been injured, by an erroneous instruction, that this court will interpose and correct the error.

In the case before us, the fact that the blow was given by the defendant, which caused the death of the deceased, was clearly and distinctly proven. Not a particle of evidence was offered which raised the slightest doubt as to the hand which dealt the fatal blow. It was certainly not a controverted fact, or one about which it was possible for the jury to doubt. Under these circumstances, it cannot be asserted that the jury were misled, and, therefore, that the defendant was injured by the instruction. On the contrary, it may, with certainty, be

affirmed that, in respect to the agent in the homicide, the jury were not, and could not have been influenced by the instruction. Such being the case, it would be to defeat instead of promoting the true purpose of the law, to set aside the verdict for this cause.

4. The court, in behalf of the prisoner, was requested to instruct the jury, that "the character of the accused, if proof has been made upon the point, is as much a fact for the consideration of the jury as any other fact in the case; and if the jury should have been satisfied of his guilt, if no proof had been made of the character of the prisoner, yet if it has been proved that the prisoner was an obedient, peaceable and submissive slave, up to the time of his alleged offense, the proof of such a character may, of itself, be sufficient to raise a reasonable doubt of his guilt, of which the jury are the judges.

This charge was refused, and the following instruction was given in lieu of it: "That the character of the prisoner, if proof has been made on the point, was as much a fact for the consideration of the jury, as any other fact in the case; but no character, however good, is sufficient to authorize the jury to find the prisoner not guilty, if the proof is otherwise clear and satisfactory, that the defendant is guilty as charged.

The refusal of the court to give the former, and the giving of the latter, is next assigned for error.

We perceive no objection to the substituted charge of which the prisoner had a right to complain, and the instruction asked for him we think was properly withheld.

No precise or definite rule has been laid down by which to determine the weight to which, in prosecutions of this character, evidence of the good character of the accused is entitled. "Juries," says Sir William Russell, "have been generally told, that where the facts proved are sufficient to satisfy their minds of the guilt of the party, character, however excellent, is no subject for their consideration; but, when they entertain any doubt as to the guilt of the party, they may properly turn their attention to the good character which he has received. It is, however, submitted, that the good character of the party accused, when satisfactorily established by competent witnesses,

is an ingredient which ought always to be submitted to the jury, with the other facts and circumstances of the case." 2 Russ. on C., 785. This view of the subject is sanctioned by high authority. Am. Cr. L., 235. And perhaps it is the better course, in no case to withdraw from the consideration of the jury, the evidence in regard to the good character of the accused. But while the good character of the accused is an ingredient which may be submitted to the jury, it would be going a great way too far to lay it down as a fixed rule, that proof of good character is sufficient to raise a reasonable doubt in the minds of the jury, when, excluding such proof, the evidence is sufficient to satisfy them of the guilt of the accused. This is the principle contained in the instruction, and for that reason there was no error in refusing it.

5. The fifth and last exception is, that the motion for a new trial was improperly overruled.

The only question raised under this assignment is, whether or not the evidence was sufficient to warrant the finding of the jury. And it is only necessary to say, without going into a minute examination and comparison of the testimony, that it was amply sufficient to sustain the verdict.

Judgment affirmed.