# Warren *v.* The State.

### Murder.

(Decided June 30, 1916.  72 South. 624.)

1. **Homicide; Malice; Presumption.**—Malice is presumed from the use of a deadly weapon unless the circumstances surrounding the killing indicate otherwise.

2. **Same; Nature and Elements.**—Whenever malice is shown and not rebutted there cannot be a conviction for any degree of homicide less than murder.

3. **Same; Instructions.**—Where defendant shot deceased, and there was nothing to suggest a lack of malice, the court properly instructed the jury to find defendant guilty of murder if they believed the evidence beyond a reasonable doubt.

4. **Same; Evidence.**—Testimony that defendant's wife told him the morning before the killing that deceased had behaved improperrly towards defendant's niece, and that a brother of deceased had assaulted her, was inadmissible because too remote.

5. **Same; Instructions.**—The failure of the court to sufficiently define murder in the second degere cannot be made the basis of error where no objection is interposed or exception reserved.

(Mayfield, J., dissents.)

APPEAL from Lawrence Circuit Court.

Heard before Hon. ROBERT C. BRICKELL.

John Warren was convicted of murder and he appeals. Affirmed.

CALLAHAN & HARRIS, for appellant. W. L. MARTIN, Attorney General, and HARWELL G. DAVIS, Assistant Attorney General, for the State.

MAYFIELD, J.—Appellant was indicted and convicted of murder in the first degree, and sentenced to life imprisonment in the penitentiary.

The trial court instructed the jury in part as follows: "This defendant is indicted for murder in the first degree. The indictment also charges murder in the second degree. The state has requested me, in writing, to charge you that if you believe the evidence beyond a reasonable doubt, you must find the defendant guilty of murder. I am going to give you that charge. So, then, gentlemen, it is only necessary for me to charge you, then, upon murder in the first and second degree."

The first and grave question involved is, Can a trial court ever give such a charge as to any degree of homicide which involves malice or malice aforethought? If the above question be answered in the affirmative, then was it proper to give the instruction in this case? The first question is one purely of law; the second, a mixed question of law and fact. Mr. Thompson, in his work on Trials, answers the first question as follows: "In criminal cases the judge has no power to direct a verdict of guilty, no matter how clear, unimpeached, and free from suspicion the evidence for the prosecution may be. Under constitutional provisions existing, it is assumed, in all the states, which guarantee to persons accused of crime the right of trial by jury, an accused person has, in every case where he had pleaded not guilty, the absolute right to have the question of guilty or not guilty submitted to the jury, no matter what the state of the evidence may be. Such is the nature of the right thus granted that it has been frequently held that it cannot be waived by the prisoner, and that the trial of a criminal case before the court without a jury is erroneous, even where it takes place with the prisoner's consent. So far as the writer is aware, the only respectable American authority in favor of the proposition that the judge can direct a

verdict of guilty in a criminal case is the ruling of Mr. Justice Hunt, in the Criminal Court of the United States, on the trial of an indictment against Susan B. Anthony for illegally voting at a federal election."—Volume 2, p. 1530, § 2149.

This ruling was set aside on appeal, and the action of the judge making it was severely criticised:

Judge Cooley, in his inestimable work on Constitutional Limitations, after discussing the province of courts and of juries in the trial of criminal cases, and of the much-vexed question whether or not in such trials the jury are the judges of the law as well as of the facts, adds a note to the text, and cites thereto many well-considered cases to support the note. This note and the authorities cited are as follows: "The province of the jury is sometimes invaded by instructions requiring them to adopt, as absolute conclusions of law, those deductions which they are at liberty to draw from a particular state of facts, if they regard them as reasonable; such as, that a homicide must be presumed malicious, unless the defendant proves the contrary, which is a rule contradictory of the results of common observation, or that evidence of a previous good character in the defendant ought to be disregarded, unless the other proof presents a doubtful case, which would deprive an accused party of his chief protection in many cases of false accusations and conspiracies. See *People v. Garbutt*, 17 Mich. [97 Am. Dec. 162]; *People v. Lamb*, 41 N. Y. 360; *State v. Henry*, 50 N. C. 66; *Harrington v. State*, 19 Ohio St. 269; *Silvus v. State*, 22 Ohio St. 90; *State v. Patterson*, 45 Vt. 308 [12 Am. Rep. 200]; *Remsen v. People*, 43 N. Y. 6; *Kistler v. State*, 54 Ind. 400."—Seventh Ed., p. 466, note.

This accurate and famous author and judge says, in the text (Id. pp. 462-464): "In one class of cases, that is to say, in criminal prosecutions for libels, it is now very generally provided by the state Constitutions, or by statute, that the jury shall determine the law and the facts. How great change is made in the common law by these provisions it is difficult to say, because the rule of the common law was not very clear upon the authorities; but for that very reason, and because the law of libel was sometimes administered with great harshness, it was certainly proper and highly desirable that a definite and liberal rule should be thus established. In all other cases the jury have the clear legal right to return a simple verdict of guilty or not guilty, and in so doing they necessarily decide such questions of law as well as of fact as

are involved in the general questions of guilt. If their view conduce to an acquittal, their verdict to that effect can neither be reviewed nor set aside. In such a case, therefore, it appears that they pass upon the law as well as the facts, and that their finding is conclusive. If, on the other hand, their view leads to a verdict of guilty, and it is the opinion of the court that such verdict is against the law, the verdict will be set aside and a new trial granted. In such a case, although they have judged of the law, the court sets aside their conclusion as improper and unwarranted. But it is clear that the jury are no more the judges of the law when they acquit than when they condemn, and the different result in the two cases comes from the merciful maxim of the common law, which will not suffer an accused party to be twice put in jeopardy for the same cause, however erroneous may have been the first acquittal. In theory, therefore, the rule of law would seem to be that it is the duty of the jury to receive and follow the law as delivered to them by the court; and such is the clear weight of authority."

He cites decisions of this court as supporting his conclusions, and they clearly support the text. The first utterance of this court on the subject is in the case of *State v. Jones*, 5 Ala. 672, where it is said: "The power of the jury to judge both of law and fact results necessarily from the very constitution of that body, and from their right to find a general verdict for the prisoner, which the court cannot disturb. This right is explicitly admitted by Littleton & Coke, and other ancient writers upon the common law. [Coke Litt. 228a.] So in 4 Black. Com. 361, it is laid down that if the jury doubt the matter of law, they may choose to find a special verdict; but have an unquestionable right to find a general verdict, and determine the law as well as the fact. At the same time it cannot be doubted that these sages of the law considered it the duty of the jury to receive the law from the court, and that it was at the 'hazard of a breach of their oaths, when they undertook the decision of questions of law.' [See, also, *People v. Croswell*, 3 Johns. Cas. (N. Y.) 337.]"

The decision in this case has been several times followed without qualification, but has been elaborated. See *Pierson v. State*, 12 Ala. 149; *Batre's Case*, 18 Ala. 119; *Washington v. State*, 63 Ala. 135, 35 Am. Rep. 8. In this last-cited case the opinion quotes approvingly from the opinion in *Batre's Case*, delivered by DARGAN, C. J., the following: "It has been said by courts of

[Warren v. The State.]

respectable authority that the jurors in a criminal case are the judges of the law as well as the facts, but we think this opinion arises from not distinguishing between the powers that a jury may assume to exercise and the duties confided to them by law. The law does not constitute them the judges, yet they may assume the responsibility of rendering a verdict contrary to the law, as given to them in charge by the court; and if they do so in a criminal case, and acquit the prisoner, their verdict is conclusive, for it is not under the control of the court."

In the last-cited case it was decided that in cases which involve intent, or a state of mind, as murder or assault with intent to murder, it is for the jury, and not the judge, to determine the "quo animo." In that case there was no conflict in the evidence, yet the court held that the state of the defendant's mind at the time of the alleged offense was for the jury and not the court.

It is quite true that the affirmative charge has been given in some misdemeanor cases which involved no intent or quo animo, and which were mere statutory offenses, and were offenses or crimes merely because the statute made them such. But the propriety of giving the affirmative charge in such cases has always been doubted.

In the case of *Weil v. State*, 52 Ala. 22, the defendant was on trial for a misdemeanor—merely violating the revenue law by carrying on a business without paying the license tax—and the trial court gave the affirmative charge against the defendant. The court, per BRICKELL, C. J., said of this charge: "A charge of this kind should be but seldom, if ever, given in any criminal case. It is an invasion of the province of the jury in any case, civil or criminal, unless the evidence is clear, positive, and undisputed. If the evidence is circumstantial, or any material fact is to be drawn as an inference, and is not a legal presumption from it, such a charge is erroneous. In this case, the true inquiry is, What was the intent of the appellants in the acts supposed to be evidence of their being engaged in, and carrying on, the business of wholesale dealers in spirituous liquors? That intent, it was the province of the jury to deduce from the evidence. However irresistible the inference may have seemed to the court from the evidence, the jury should have been left free and unrestrained in pronouncing their verdict on it. In giving this charge, the court erred."

In the case of *Perkins v. State*, 50 Ala. 154, treating a similar charge, the court (speaking through the same Chief Justice) said: "The intent is matter of fact, to be ascertained by the jury from the evidence. The facts stated in the charge are proper evidence for the jury in ascertaining the intent; but, in assuming and declaring that, as matter of law, they established the guilt of the appellant, the court erred."

This same doctrine is announced in a recent case as follows: "To quote one, in accord with the rule obtaining here, from time immemorial, by which the propriety of the affirmative charge has been often determined, STONE, C. J., in *Tabler v. Sheffield Land Co.*, 87 Ala. 309, 6 South. 197, treating an affirmative charge that was framed with hypothesis, said: 'To support the general charge, the evidence must be so clear and convincing as that the court could rightly sustain a demurrer to the evidence of the opposite party. If the evidence be in conflict, or if it be circumstantial, or if a material fact in the case rest in inference, the general charge should not be given.' To the same effect, where the charge bore the usual hypothesis, are, among others, *Weil v. State*, 52 Ala. 22, by BRICKELL, C. J., and *Bridges v. Tenn. Co.*, 109 Ala. 294, 19 South. 495. The giving of the affirmative charge is a declaration of law by the court, just as its action in sustaining a demurrer to the evidence is a pronouncement of law."— *Harris v. N., C. & St. L. Ry.*, 153 Ala. 149, 44 South. 966.

In the case of *Brown v. State*, 109 Ala. 70, 20 South. 103, the giving of the affirmative charge with hypothesis, against the defendant in a murder trial, was held to be reversible error. It is true that *Brown's Case* is distinguishable from the case in hand, for the reason that the charge in that case required or requested a verdict of guilty of murder in the first degree, and thus prevented the jury from determining the degree of murder which the statute (Code, § 7087) expressly requires the jury to ascertain and fix in their verdict; while in the case in hand the instruction given only required or requested a verdict of murder, and the court left the question to the jury to fix the degree. That decision was therefore put on the ground that the charge ignored the statute, and was for that reason bad. The opinion in that case was written by the same eminent Chief Justice, and contained abundant dicta to show that the giving of the charge would have been error had there been no such statute, or had the charge requested only a verdict of murder. In that opinion the

writer, among other things, says: "Murder at common law was defined, or rather described by Lord Coke, in these words: 'When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought.' The presence of malice, express or implied, was the distinguishing characteristic of murder, as the absence of malice, manifested by the presence of provocation, was the distinguishing characteristic of voluntary manslaughter. The statutes, as has been often explained, from motives and considerations of humanity, without changing the common-law definition of murder, without adding to or taking away any of its constituents, for the purposes of punishment only, have divided it into two degrees; murder in the first, and murder in the second degree."—109 Ala. 74, 20 South. 104.

"The essential constituents of murder in the first degree, when, as in the present case, the homicide is not perpetrated under and of the particular circumstances or conditions enumerated in the statute, are that the taking of life must have been willful, deliberate, malicious, and premeditated. These must concur and co-exist, or, whatever other offense may be committed, this offense of statutory creation is not committed. There is no possible state of facts from which the law presumes their concurrence and coexistence; and their concurrence and coexistence is not a fact to which a witness, or any number of witnesses, can testify."—109 Ala. 79, 20 South. 106.

In *Hornsby's Case*, 94 Ala. 55, 10 South. 522, which was followed and quoted in *Dennis' Case*, 112 Ala. 67, 20 South. 925, it was held, in effect, that whether the design or positive intention to take life springs from the moving constituents of murder in the first degree, or murder in the second degree, or manslaughter, or self-defense, is always a question of fact for the jury, under proper instructions of the court. A charge of murder or of an assault with intent to murder, not only charges the killing in the one case and the assault in the other, but also charges an intent to murder; the latter being as necessary an allegation as the former. As said by Chief Justice RICE, in *Ogletree's Case*, 28 Ala. 693, 701: "The defendant is indicted not merely for what he has effected, but for what he intended to effect."

Mr. Wharton, in his work on Criminal Evidence (8th Ed.) § 738, p. 591 et seq., makes plain the error into which the trial court fell. He says: "We must keep in mind that the doctrine

that malice and intent are presumptions of law, to be presumed from the mere act of killing, belongs, even if correct, to purely speculative jurisprudence, and cannot be applied to any case that can possibly arise before the courts.   *   *   *   What the law punishes is not killing, but particular modes of killing, and those must be averred and proved.   Now these modes, when proved, form facts from which intent is to be inferred or negatived."

In the famous case of *People v. Garbutt*, 17 Mich. 9, 21, 22, 97 Am. Dec. 162 et seq., the question was considered, discussed, and decided by a no less eminent authority than Judge Cooley, who was then Chief Justice of that court; and he said, among other things: "The prosecution takes upon itself the burden of establishing, not only the killing, but also the malicious intent in every case.   There is no such thing in the law as a separation of the ingredients of the offense, so as to leave a part to be established by the prosecution, while as to the rest the defendant takes upon himself the burden of proving a negative.   The idea that the burden of proof shifts in these cases is unphilosophical, and at war with fundamental principles of criminal law.   The presumption of innocence is a shield to the defendant throughout the proceedings, until the verdict of the jury establishes the fact that beyond a reasonable doubt he not only committed the act, but that he did so with malicious intent."

The leading case, however, upon the subject, and the one which Judge Cooley says settles the law correctly, is *Maher v. People,* 10 Mich. 212, 217, 218, 220, 81 Am. Dec. 781, now quoted:

"Homicide, or the mere killing of one person by another, does not, of itself, constitute murder; it may be murder, or manslaughter, or excusable or justifiable homicide and therefore entirely innocent, according to the circumstances, or the disposition or state of mind or purpose, which induced the act.   It is not, therefore, the act which constitutes the offense or determines its character, but the quo animo, the disposition, or state of mind, with which it is done.   'Actus non facit reum nisi mens sit rea.'— *Pond v. People,* 8 Mich. 150.   To give the homicide the legal character of murder, all the authorities agree that it must have been perpetrated with malice prepense or aforethought.   This malice is just as essentially an ingredient of the offense as the act which causes the death; without the concurrence of both the crime cannot exist; and, as every man is presumed innocent of

[Warren v. The State.]

the offense with which he is charged till he is proved to be guilty, this presumption must apply equally to both ingredients of the offense—to the malice as well as to the killing. Hence, though the principle seems to have been sometimes overlooked, the burden of proof as to each rests equally upon the prosecution, though the one may admit and require more direct proof than the other; malice, in most cases, not being susceptible of direct proof, but to be established by inferences more or less strong, to be drawn from the facts and circumstances connected with the killing, and which indicate the disposition or state of mind with which it was done. It is for the court to define the legal import of the term, 'malice aforethought,' or, in other words, that state or disposition of mind which constitutes it; but the question whether it existed or not, in the particular instance, would upon principle seem to be as clearly a question of fact for the jury as any other fact in the cause, and that they must give such weight to the various facts and circumstances accompanying the act, or in any way bearing upon the question, as, in their judgment, they deserve, and that the court have no right to withdraw the question from the jury by assuming to draw the proper inferences from the whole, or any part of, the facts proved, as presumption of law. If courts could do this, juries might be required to find the fact of malice where they were satisfied from the whole evidence it did not exist. * * * It is doubtless, in one sense, the province of the court to define what, in law, will constitute a reasonable or adequate provocation, but not I think in ordinary cases to determine whether the provocation proved in the particular case is sufficient or reasonable. This is essentially a question of fact and to be decided with reference to the particular facts of each particular case. * * * The question of the reasonableness or adequacy of the provocation must depend upon the facts of each particular case. That can, with no propriety, be called a rule, or a question, of law which must vary with, and depend upon, the almost infinite variety of facts presented by the various cases as they arise. See Stark, on Ev. (Amer. Ed. 1860) pp. 676 to 680. The law cannot with justice assume, by the light of past decisions, to catalogue all the various facts and combinations of facts which shall be held to constitute reasonable or adequate provocation. Scarcely two past cases can be found which are identical in all their circumstances; and there is no reason to hope for greater uniformity in the future."

In a Tennessee case the killing was by shooting and in the attempt to rob; and counsel for the accused admitted that the proof showed accused to be guilty of murder in the first degree, and the court so instructed the jury; and on appeal the court said: "Whatever may be the rule in relation to misdemeanors, the weight of authority is overwhelming to the effect that in the prosecution for felony, where a plea of not guilty is interposed, "it is not permissible for the court to direct a verdict of guilty or to pass on any question of fact unfavorable to the defendant. This is true even though the incriminating evidence is uncontradicted or conclusive."—*Shipp v. State,* 128 Tenn. 499, 502, 161 S. W. 1017, 1018.

The Supreme Court of New York, in speaking on the subject, has said: "It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be, not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury. The general rule that in criminal cases the question of criminal intent must be submitted to the jury, however significant the facts may be, has frequently been declared by this court."—*People v. Flack, et al.,* 125 N. Y. 334, 335, 26 N. E. 270, 11 L. R. A. 807.

The affirmative charge should never be given in a case like this, because proof of good character alone is sufficient to generate a reasonable doubt, and the legal presumption of innocence is to be regarded by the jury in every case as matter of evidence. These two rules of evidence are well stated by BRICKELL, C. J., in *Newsom v. State,* 107 Ala. 133, 138, 139, 18 South. 206, 207, as follows:

"In all criminal prosecutions, whether the offense charged is statutory, or an offense at common law whether it be of felony or of misdemeanor, the previous good character of the accused is matter of evidence for him, and may generate a reasonable doubt of guilt entitling him to an acquittal."

[Warren v. The State.]

In an instruction to the jury, the evidence of good character should not be disconnected and dissociated from the other evidence in the cause, which may be so clear and convincing of guilt as to render of little or no avail the previous good character of the accused; the jury should be left free to form their conclusions upon the whole evidence.—*Goldsmith v. State,* 105 Ala. 8, 16 South. 933, and authorities cited. The fourth charge requested by the defendant was free from the infirmities which vitiated instructions in reference to good character in numerous cases referred to in *Goldsmith's Case,* and ought to have been given.

"The legal presumption of innocence is to be regarded by the jury, in every case, as matter of evidence, to the benefit of which the party is entitled."—1 Green. Ev. § 34.

And as matter of evidence, the presumption attends the accused until his guilt is, by the evidence, placed beyond a reasonable doubt.—*Coffin v. U. S.,* 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481.

In *Goldsmith's Case, supra,* it is said: "The true doctrine is that declared in the text of the opinion in the case of *Felix v. State,* 18 Ala. 725: 'We are of opinion that evidence of the general character of the accused, having reference and analogy to the subject of the charge, is competent as original testimony—as a circumstance to be considered in determining whether he is guilty of the crime alleged against him—and may be considered, in connection with the other facts and circumstances, even to generate a doubt in the minds of the jury.' "—105 Ala. 12, 16 South. 934.

What was said in *Newsom's Case, supra,* as to the presumption of innocence being evidence for the defendant, and a fact for the consideration of the jury, has been often approved and followed. See *Bryant v. State,* 116 Ala. 446, 23 South. 40; *Amos v. State,* 123 Ala. 50, 26 South. 524; *Neilson v. State,* 146 Ala. 683, 40 South. 221; *Bailey v. State,* 168 Ala. 4, 53 South. 296, 390.

In *Bailey's Case, supra,* the question was decided, and the case was reversed for the refusal of the court to instruct the jury that: "The defendants enter into this trial with a presumption of innocence, and this is a fact in the case which must be considered with the evidence, and should not be disregarded."

Justice EVANS dissented in that case, holding and contending that if such be the law, the general affirmative charge could never be given against the defendant. It is very true that there

is in our reports a number of cases in which the trial court gave the affirmative charge against the defendant and the case was here affirmed on appeal; but there are many more cases in which the judgments were reversed on account of the giving of such charges. There is, however, no case in which the court discussed the question fully, or expressly affirmed or denied the proposition that so directing the verdict denies or impairs the defendant's constitutional right to have a trial by jury, except as we will hereafter point out.

The court has often spoken of the inestimable value of this right to the defendant, of its being a right reserved to the citizen by the Constitution, and of its deprivation or impairment not being therefore within the power of the state or government formed by the Constitution. It has often been said by the court that the giving of such charges in criminal cases is always of doubtful propriety, thus implying that there could be cases in which such instructions would be proper; and, as before stated, in some instances the giving of such instructions has been affirmed. In the case of *Jones v. State,* 96 Ala. 56, 11 South. 192, it was expressly decided that the giving of such instructions was sometimes proper; and the court spoke as follows, and cited the following cases in support of the holding:

"The argument of defendant's counsel that the giving of the general affirmative charge for the state was an invasion or denial of defendant's constitutional right to a trial by jury cannot prevail. It has been too long and firmly settled in the jurisprudence of this state now to be disturbed, except by legislation, that giving of such charge by the trial court, in a criminal case, is not a denial or impairment of the defendant's constitutional right to a trial by jury when the evidence of guilt is clear, positive, and undisputed.—*Johnson v. State,* 91 Ala. 70 [9 South. 71]; *Olmstead v. State,* 89 Ala. 16 [7 South. 775]; *Brinson v. State,* 89 Ala. 105 [8 South. 527]; *Prestwood v. State,* 88 Ala. 235 [7 South. 259]; *Cagle v. State,* 87 Ala. 38 [6 South. 300]."

This decision, however, has been expressly overruled; and those cases cited and claimed to support it are, of course, overruled by necessary implication. *Jones' Case* (here referred to) was followed and cited in *Parrish's Case,* 139 Ala. 16, 51, 36 South. 1012, 1023, where it is said: "The general affirmative charge is of doubtful propriety in criminal cases. Yet this court has, time and time again, held that where there is no evidence

upon which a verdict of acquittal could be based, or where all the facts and evidence point to guilt, and where the evidence is uncontroverted and is of a conclusive character, the general affirmative charge may be given against the defendant in criminal cases.—*Taylor v. State,* 121 Ala. 24, 25 South. 689; *Jones v. The State,* 96 Ala. 56 (11 South. 192)." No charge, however, was given or requested in that case, and hence the above was purely dictum. In the case of *Taylor v. The State,* cited above, it is said: "In the absence of conflicting testimony to the fact of guilt a charge affirmative of guilt, predicated upon the belief of the testimony by the jury, may be given, though this court has reiterated that such a charge is of doubtful propriety as against a defendant in a criminal case, and should never be given where there is any evidence upon which a verdict of acquittal could be based, or where the facts in evidence pointing to guilt rest in inference only."

*Jones' Case,* 96 Ala. 56, 11 South. 192, was expressly overruled in *Townsend's Case,* 137 Ala. 92, 34 South. 382, and four cases cited. It was there said: "It is true there is no conflict in the evidence as to the guilt of the defendant, but the credibility of the witnesses was matter for determination by the jury. It was therefore error for the court, at the written request of the solicitor, to instruct the jury that if they believe the evidence, they must find the defendant guilty. This instruction required his conviction although the jury may not have believed the evidence beyond a reasonable doubt.—*Jackson v. State,* 106 Ala. 12 [17 South. 333]; *Carr v. State,* 104 Ala. 4 [16 South. 150]; *Shields v. State,* 104 Ala. 35 [16 South. 85, 53 Am. St. Rep. 17]; *Harris v. State,* 100 Ala. 129 [14 South. 538]; *Pierson v. State,* 99 Ala. 148 [13 South. 550]; *Heath v. State,* 99 Ala. 179 [13 South. 689]."

In *Eiland v. State,* 52 Ala. 332, it is said, per BRICKELL, C. J.: "The law is that when life is taken with a deadly weapon, malice is presumed, for the inference is that the natural or probable effect of any act deliberately done is intended by its actor.— Whart. Am. Crim. Law, 944. It is the peculiar province of the jury, however, to draw the presumptions or inferences from the facts in evidence. When the circumstances attending the killing are shown, no one fact should be singled out and disconnected from the other evidence, and malice, or any other necessary fact inferred or presumed from it. Whether from all the facts malice is fairly to be presumed the jury should determine."

An inference of malice might well be drawn from all the facts proven in this case, but the jury, and not the judge, must do the inferring. The instruction of the court was, in legal effect, that the jury must infer malice, if they believe the evidence beyond a reasonable doubt. The jury might believe every fact testified to by any witness, and yet might not believe beyond a reasonable doubt that the killing was malicious. Charges like this can never be given when a material ingredient of the crime of necessity rests in inference; that is, must be inferred from other facts. This is one of the exceptions, even in civil trials, to the giving of the affirmative charge with hypothesis when there is no dispute about the facts proven.

"The affirmative charge should not be given when the evidence is conflicting as to any material question necessary for the verdict, or when the evidence is circumstantial, or when a material fact rests wholly in inference; but it may be given, should on request be given, whenever the court would sustain a demurrer to the evidence interposed by the party requesting the instruction. *Smoot v. M. &. M. Ry. Co.,* 67 Ala. 17; *Tabler v. Sheffield Co.,* 87 Ala. 309, 6 South. 196."—*Tobler v. Pioneer, etc., Co.,* 166 Ala. 518, 52 South. 98.

If this be an exception in civil cases, surely it applies in criminal cases.

In Blashfield's Instructions to Juries (volume 1, § 70, p. 144), it is said: "In criminal cases the weight of authority is to the effect that it is never proper to direct a verdict of guilty."

Alabama is given as one of the state courts supporting the text, but the cases cited do not support the text to the full extent —doing so, only by inference, and to a partial extent. The decisions of many other courts are cited, which do fully support the text. See *State v. Wilson,* 62 Kan. 621, 64 Pac. 23, 52 L. R. A. 679. The best and most fully considered cases which he have found on the subject are those of the Supreme Court of Montana. See *State v. Koch,* 33 Mont. 490, 85 Pac. 272, 8 Ann. Cas. 804; *State v. Sloan,* 35 Mont. 367, 89 Pacfl 829. The opinions in these cases review text-writers, and other decisions, on the subject. In the note to 8 Ann. Cas. 808, supra, the authorities are collected, and several decisions of this court are cited as supporting the rule announced, the note being as follows: "The decision of the reported case is in accordance with the general rule that in a criminal case, where a plea of not guilty has been entered, it is error

for the court to advise the jury to convict, or to direct a verdict of guilty. Alabama—*Huffman v. State,* 29 Ala. 40; *Nonemaker .v. State,* 34 Ala. 211; *Sims v. State,* 43 Ala. 33; *Perkins v. State,* 50 Ala. 154."

None of these Alabama cases, however, discuss the subject at length or assign reasons for the rule; and such charges are condemned because they do not require the jury to believe the evidence beyond a reasonable doubt, but are said to be otherwise good.

The trial court evidently acted upon the theory, in this case, that as the evidence without dispute showed that defendant killed the deceased willfully, by shooting him with a gun, the law conclusively presumed malice, in the absence of proof to show justification or extenuation, and that the killing was therefore murder. This error has been well pointed out by the Supreme Court of Indiana, in the case of *Clem v. State,* 31 Ind. 480, 484, where it is said: "The following charge was given at the request of the prosecution: '(6) Every sane man is conclusively presumed to contemplate the natural and probable consequences of his own acts; and therefore the intent to murder is conclusively inferred from the deliberate use of a deadly weapon.' This, though transcribed from an approved text-book (1 Greenl. Ev. § 18), is not sustained by the authorities which the writer cities in its support. It is entirely at variance with principles which have received the uniform sanction of all the courts in this country and Great Britain. It is a great inaccuracy, and it is strange that a book which has passed through so many editions should still contain it. A conclusive presumption admits of no proof to rebut it; and murder is a felonious killing. Such is the technical, as well as popular, meaning of the significant terms used in the instruction."

## MALICE AFORETHOUGHT—INTENT.

No killing is murder unless it involves malice aforethought. Malice aforethought, in turn, involves either a positive and actual intent to take life, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily harm may result. It is not necessary, however, that there should be alleged or proven a specific or actual will or intent to take life. If the acts of killing alleged and proven are acts from which malice and

intent may be inferred, this is sufficient to support a conviction of murder. Proof of such facts, however, as will authorize or warrant the inference of malice and intent, does not make the existence of malice and that of intent questions of law; such are purely questions of fact, which the jury may or may not infer. To infer the existence of one fact from the proof of another is the exclusive province of the jury on the trial of facts. It is not for the court in such cases to instruct the jury that they must or must not infer malice or intent to take life; he may charge or instruct them that they may or may not so infer, but not that they must or must not so infer. This invades the province of the jury as much as it would to tell them that they must or must not believe the testimony of a given witness.

The question of the propriety of charges in reference to the element of intent, in murder trials, was twice fully considered by this court, in *Fowler's Case,* 155 Ala. 21, 45 South. 913, and Id.; 161 Ala. 1, 49 South. 788. On the first appeal certain charges requested by the defendant as to the proof of intent were held bad, because they required the jury to find a specific or actual intent to take life. On the last appeal similar charges were held good, because cured of the former defect. The court, speaking through DOWDELL, C. J., after stating the law on the subject, said: "We adhere to the law as above laid down in the cited cases; and, in so far as there is anything in what is said in the opinion in this case on the former appeal opposed thereto, to that extent it is overruled. On the law as above stated, and under the evidence in this case, we are of the opinion that the written charges numbered from 1 to 6, which were refused to the defendant, should have been given. They are unlike Charges 3, 5, and 6, condemned on the former appeal, which only hypothesized the absence of an actual intention to kill."

Charge 1 was as follows: "The court charges the jury that the defendant cannot be convicted of murder in the second degree or manslaughter in the first degree unless the defendant had the intention to kill Missouri Fowler, or intended to do an act of violence from which, ordinarily, in the usual course of events, death or great bodily harm may be the consequence."

Justice DENSON dissented in the case on the last appeal, and, after stating the old rule as to the presumption of malice and intent from a willful killing with a deadly weapon, said: "The rule has been slightly modified, and is thus accurately stated:

[Warren v. The State.]

'Where the killing is proved, and no more, the law will imply malice, and make the act murder; but, when all the facts and circumstances of the killing are in evidence, then the jury must say from the evidence what was the intention with which the act was committed. Then it becomes a matter of proof—no longer implication.'—*Alexander's Case*, 30 S. C. 84, 8 S. E. 440, 14 Am. St. Rep. 879; *Vollmer's Case*, 24 Neb. 838, 842, 40 N. W. 420; *Harris' Case*, 8 Tex. App. 90."—161 Ala. 11, 49 South. 791.

Here all the facts and circumstances of the killing were in evidence—a part given by the state and a part by the defense. Hence, according to the rule contended for by Judge DENSON, this was a case in which "the jury must say from the evidence what the intention was." This result flows as a necessary sequence from the following indisputable precepts of the criminal law, some of which embody constitutional rights of the citizen, or, more accurately speaking, are inalienable and natural rights which the citizens reserved unto themselves and their property, when they formed the Constitution and agreed to enter into a written constitutional government. These rights, so expressed and declared in the Bill of Rights, never passed into the government created or declared to exist by the Constitution. Consequently the state or government created never had the power to deny or impair the citizen's inalienable right to trial by jury in felony cases.

There can be no crime, like murder, without an evil mind. This is declared in the ancient maxim, "Actus non facit reum, nisi mens sit rea."—*Stein v. State*, 37 Ala. 123.

When the crime involves intent, the wrongful act and the wrongful intent must concur, to constitute the crime.—*Davis v. State*, 68 Ala. 58, 44 Am. Rep. 128; *Gordon v. State*, 52 Ala. 308, 23 Am. Rep. 575. In such cases the bad intent is an element of the crime, and must be alleged and proven.—*Hampton v. State*, 45 Ala. 82; *Ogletree v. State*, 28 Ala. 693.

Intent or motive, from its very nature, is not the subject of direct proof; it must be inferred from the existence of other facts. This inferring must be done by the jury and not by the court.—*Brown's Case*, 79 Ala. 51. This is especially true in Alabama, for the reason that it is the only jurisdiction in the Union which declines to allow a witness to testify directly as to his own intent or motive in doing, or in failing to do, a given deed or act. Consequently, in this state, there can never be any direct proof

of intent or motive; and its existence or nonexistence, and whether it be good or bad, must always be inferred by the jury, or the trier of facts, from the existence of other facts. For this reason this court has uniformly ruled, when its attention was directly called to the matter, that the affirmative charge with, or without, hypothesis should never be given in a civil or a criminal case when a material fact rests in inference from other facts.— *Tobler v. Pioneer Mining & Mfg. Co.*, 166 Ala. 482, 52 South. 86.

To deny the jury the right of judging of the intent or malice aforethought in murder, which of necessity must be inferred from other facts, is to take away the substance, and with it, the value and security, of trial by jury in felony cases, which the Constitution both reserves and guarantees.

In all criminal trials for felonies at common law, the juries are charged with the deliverance of the defendant from the crime of which he is charged. In such trials, the jury, from the very nature of the issue raised on a plea of not guilty, must not only find the facts alleged, but also the crime alleged; and often the intent with which the act alleged is done determines the crime or the degree of the crime. While, as this and other courts have said, they are not the judges of the law in the sense that they should not heed the instructions of the court, or that they ought to disregard the instructions and advice of the court as to the law. The judge is a part of the right of jury trial, and his function is to aid and instruct the jury in ascertaining and deciding the law; yet, the law and the facts are so involved and amalgamated in criminal trials, by the plea of not guilty, that the jury are under an indispensable necessity to decide both, under the instructions of the court, unless they choose to separate the law from the facts, by finding a special verdict, and then they thereby decline to pass upon the law, and put the question of law up to the judge. But they alone have the right to say whether they will render a general or a special verdict.

One of the most valuable rights of a trial by jury in criminal cases, and that which distinguishes the right from that in civil cases, is the right of the jury to render a general verdict; that is, to say, "guilty" or "not guilty," no matter what the witnesses may say as to the evidence, nor what the judge may say as to the law. Of course the jury ought no more to arbitrarily disregard the instructions of the judge than they ought to arbitrarily disregard the testimony of witnesses; but they can do both, and

[Warren v. The State.]

ought to do so, when both are founded on, or are in, error. Jurors are not bound to follow what a witness says as to the facts, nor what the judge says as to the law; the two being only agencies to aid them in arriving at a "true saying," a verdict.   As no one can have a right to do wrong, the jury therefore have no right to disregard the evidence of a witness that is true.   The power of the jury to say, "Not guilty," no matter what the testimony of the witnesses, or the instructions of the judge, may be, is admitted by all.   It is, however, denied that they can arbitrarily so exercise the power without compromising their conscience. However this may be, it is conceded by all that a verdict of "not guilty" in a criminal case is in every respect absolutely final.   The jury in such case are not liable to punishment, nor the verdict to further control or ever to be called into question.   No attaint lay at common law, as it did in civil cases, and no new trial was, or is granted at common law or by statute.   Nothing that depends upon human agencies is any more final that a verdict of "not guilty,' in a criminal case.

We have a provision in our Constitution (Const. 1901, § 12) that in all prosecutions for libel the jury shall be the judges of the law as well as of the facts.· Whether that provision when originally placed in our Constitution was intended to make the rights of juries in libel cases different from, and more extended, than what they are in other criminal cases we do not attempt to decide. The history of it, however, tends strongly to show that it was intended only to give them the same rights and powers in libel cases which they had in all other criminal cases.

The question was first brought prominently to public attention in England, in prosecutions for criminal libel.   Some of the English judges, in those prosecutions, took the position that whether or not a given publication was libelous was a question of law for the court, and that the jury must follow the instructions of the court in that respect.   The legal profession, as a rule, led by Lord Erskine, held that the jury in such trials were judges of the law as well as of the facts, and were not bound to follow the instructions of the court.   As the question raised involved two constitutional guaranties, the right of jury trial, and the freedom of the press, it attracted the attention and aroused the interest, not only of England, but also of America.   The question was brought before Parliament and debated during two consecutive sessions (1791 and 1792).   There was engaged in this discussion

probably the greatest legal talent, knowledge, and wisdom, of the age. The question was examined thoroughly, both upon principle and precedent. The result of the matter was the passage of the Fox Libel Act. It was entitled, "An act to remove doubts respecting the functions of juries in cases of libel." Both in the preamble and in the body of the act it was declared that the jury in such cases should be the judges of both the law and the facts, as in other criminal cases.

Chancellor Kent, in *Croswell's Case*, reported as an appendix to 3 Johns. Cas. (N. Y.) 337 et seq., after giving the history of the question in England, says: "It was, no doubt, under similar impressions of the subject that the act of Congress, for punishing certain libels against the United States (Laws U. S., vol. 4, p. 204), enacted and declared that the jury who should try the cause should have a right to determine the law and fact, under the direction of the court, as in other cases; and, before the passing of that statute, the same doctrine was laid down in full latitude and in explicit terms by the Supreme Court of the United States [*Georgia v. Brailsford*] 3 Dall. 4 [1 L. Ed. 483]."

In the case cited by Kent, the first Chief Justice of the Supreme Court of the United States said (3 Dall. 4, 1 L. Ed. 483): "It may not be amiss here, gentlemen, to remind you of the good old rule that on questions of fact it is the province of the jury, on questions of law it is the province of the court, to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have, nevertheless, a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt you will pay that respect which is due to the opinion of the court; for, as, on the one hand, it is presumed that juries are the best judges of facts, it is, on the other hand, presumable that the court are the best judges of law. But still both objects are lawfully within your power of decision."

The specific question first arose in New York in 1803, in *Croswell's Case*, reported in 3 Johns. Cas. as appendix, 337. Croswell was indicted for publishing a libel against Thomas Jefferson, the then President of the United States. The alleged libel was: "Holt says the burden of the federal song is that Mr. Jefferson paid Callender for writing against the late administration. This is wholly false. The charge is explicitly this: Jefferson paid

Callender for calling Washington a traitor, a robber, and a per-
jurer; for calling Adams a hoary-headed incendiary; and for
most grossly slandering the private characters· of men who he
well knew were virtuous.  These charges, not a democratic editor
has yet dared, or ever will dare, to meet in an open and manly
discussion."

This was published in a newspaper called "The Wasp."  Cros-
well was convicted in the lower court, and appealed.  One of the
five Justices was disqualified, and the other four were equally
divided on the question whether the jury should judge of both
the law and fact, Kent and Thompson holding to the affirmative,
and Lewis, C. J., and Livington holding to the negative.  Thomp-
son and Livingston were both subsequently Judges of the Supreme
Court of the United States.  While this case was pending, the
Legislature of New York passed a statute similar to the Fox Libel
Act, and the act of Congress.  The preamble, and part of the
body of that statute are as follows:  "Whereas doubts exist
whether on the trial of an indictment or information for a libel,
the jury have a right to give their verdict on the whole matter in
issue:

"Be it therefore declared    *    *    *

"That on every such indictment or information, the jury, who
shall try the same, shall have a right to determine the law and the
fact, under the direction of the court, in like manner as in other
criminal cases," etc.—Laws 1805-06, p. 232.

The statutes were unquestionably the parents of constitutional
provisions and of the statutes of the various states in the Union
on the subject.  The provision in many of the states apply or
refer only to prosecutions for libel, without reference to the ques-
tion of doubt in "other criminal cases."  In some of the states,
like Maryland, the provision in the Constitution is not limited to
prosecutions for libel, but applies to all criminal cases alike;
but the court holds the provisions, whatever may be their word-
ing, to be merely declaratory of the common-law right of trial
by jury.  These parent statutes unquestionably show that the
provisions were either declaratory of the common law, or were
intended only to make the law the same in libel cases as in all
other criminal cases.  However this may be, all the authorities
hold that the jury in all criminal cases now and ever have had the
power to determine both the law and the fact in criminal cases;
and· they all with equal unanimity hold that the judge, not only

[Warren v. The State.]

has the power, but it is his duty, to instruct the jury as to the law in all criminal cases, and that it is reversible error for him to refuse to so instruct, if requested, or if he instructs erroneously.

The great difference of opinion is as to whether the jury have the right, as well as the power, to decide the law as well as the facts in criminal cases. I cannot understand how it is possible for the law itself to confer upon, and repose in, a jury a power which it does not confer upon any other person, officer, body or tribunal, and then allow its exercise without any restraint or revision by any other person, body, or tribunal, or even by the law itself, and yet withhold the right to exercise the power so conferred. If the law provided any means, or made it possible, to restrain or revise the exercise of the power conferred, then the right to exercise it would be, to this extent, limited; but, in the absence of any possibility of revising or controlling the exercise of the power, does it not necessarily follow that the right conferred is as absolute as the power? To speak of a person or of a body of persons as having the right to do a given thing they are bound not to do is not logic; it is not even sophistry: it is a non sequitur.

The rules and law of pleading were established to make and preserve the distinct jurisdictions of the court and the jury, by a separation of the law from the fact, wherever a separation was intended. In criminal cases no separation was ever intended or has ever been made. A defendant must plead guilty or not guilty; if he declines to plead, the court must have the plea of not guilty interposed for him. This plea has always, from the date of the Norman Conquest down to the date of Warren's trial (the trial in this case), had the effect to throw the accused upon his country for a general deliverance. This submits his whole defense, whether it be a negation of facts, or a justification in law. It has always been held by all English and American courts that this plea so blends the law and the facts as to make them inseparable by the court, or in any other mode, except by the voluntary act of the jury finding a special verdict. The defendant, under this plea, may admit every fact alleged in the indictment, and yet give evidence of other collateral facts which have any tendency to show a legal excuse or justification, and may receive from their verdict a complete, general, and conclusive deliverance.

No one denies that our Constitution guarantees to the accused every right as to jury trials which the great English writs guar-

anteed to the colonists prior to the Declaration of Independence. Surely no better authority as to what those rights were can be found than Mr. Justice Blackstone and Sir Matthew Hale. They spoke on the subject as follows: Mr. Justice Blackstone, in the fourth volume of his Commentaries, page 339, says: "These charges of a traitorous or felonious intent are the points and very gist of the indictment, and must be answered directly by the general negative, not guilty; and the jury, upon the evidence, will take notice of any defensive matter, and give their verdict accordingly, as effectually as if it were specially pleaded."

This, therefore, says Sir Matthew Hale, in his Pleas of the Crown, page 258, is, upon all accounts, the most advantageous plea for the defendant: "It would be a most unhappy case for the judge himself, if the prisoner's fate depended upon his directions; unhappy also for the prisoner; for if the judge's opinion must rule the verdict, the trial by jury would be useless."

If the right of jury trial includes the right of the jury to pass upon guilt or innocence of the accused, and award a general deliverance, can the right be lawfully usurped by the court's requiring them to find a special verdict? This right of jury trial, of course, includes the right to weigh the evidence and pass upon its sufficiency; but it also includes the right to pass upon the guilt or innocence.

What constitutes a given crime, abstractly considered, is a question of law for the court; but with what intent a given act was done is a question of fact and not of law. All the dicta of all the judges in the world could not make it a question of law. From the very nature of things it is not, and cannot be, other than a question of fact.

If the accused has the constitutional right to have the general verdict of the jury, unless they voluntarily find a special one, then the prosecution, or state, has no right to have the court direct them to find a special verdict—as was done in this case. Rights which are thus repugnant and contradictory cannot coexist. The accused cannot have a right to have a thing done by the jury, if the doing of that thing deprives the prosecution of another right. No right can lawfully belong to an accused person, the exercise of which must necessarily work a wrong to the prosecutor.

The jury cannot have the absolute right or power to find a verdict of not guilty in all cases, if the court has the right or power to direct them to find one of guilty in any case. These

rights or powers are repugnant and contradictory, and cannot be coexistent. The jury cannot have the right or power to do a thing which would deprive the court of the right or power to compel them to do the opposite thing. There is no act susceptible of proof by witnesses, which the law holds to constitute murder in either degree, if abstracted from the felonious or murderous intentions of the actor. This intention, being a mental, and not a physical status, is therefore, according to its very nature, not susceptible of direct proof by witnesses. It must, of necessity, be inferred or collected by the jury from facts which are susceptible of direct proof. It is, alike physically, legally and logically, impossible to establish a criminal intent by any abstract conclusion of law. To say that it is ever possible for a criminal intent, a mental status, a quo animo, to be a conclusion of law is to say something which cannot be. Facts which are susceptible of direct proof may be, and often are, full evidence of murder; but they are not, and cannot be, the crime itself. A jury trial in a murder case requires that the jury, and not the court, find the crime itself, as well as the facts or acts which constitute it. The Constitution has placed a twofold barrier between the liberties of the citizen and the power of the state to punish for a felony: A true bill or charge by a grand jury, and a true finding of the crime charged, by a petit jury. The court can no more find the verdict than it can the true bill. The court can no more constitutionally compel the jury to find the bill or the verdict than it can, by itself, find the one or render the other. The law does not allow any court to do indirectly what it forbids being done directly.

The state's evidence was to the effect that deceased and others passed the house of defendant, riding in wagons loaded with seed cotton; that as they were passing his house they were holloing or yelling; exactly what was said or the purpose of the holloing not being made to appear. The defendant at this time was at work nigh by his house. As the parties were passing, the wife of defendant was seen to waive or motion to him; and he came to the house, and followed the parties until he overtook them and killed deceased. What happened when the defendant came upon the parties and killed deceased is thus described by some of the state's witnesses. Quill Jackson testified: "That when he first saw John Warren there he was up at the house of Pope Warren; that he saw him come out of the house and come on down the road or way to the big road. That the wagons were traveling.

[Warren v. The State.]

That he came with a gun in his hand and got down to the big road about the time the wagon got to the point where the road leading from Pope Warren's house to the big road intersected, and walked up in front of Lee Sewell and said, 'Who was that hollering?' At this time witness was just behind the wagon about five or ten steps, a little to one side. That his father, George Jackson, Tom Osbourne, Tom Yarbrough, Fred Ellenberg, and Pink McLemore were along. When Warren asked this question no one said anything. He asked again, 'Who was it hollering?' and still didn't any one speak, and he asked the third time who it was that hollered, and no one answered, and when Lee Sewell got even with him Warren said, 'Now holler,' and Lee Sewell said, 'I am not afraid to,' and John said, 'You say that again, and I will blow your God damn head off,' and Lee said, 'You won't do it.' At this time Warren raised the gun, then let it down, then raised the gun the second time and let it down, and the third time he raised it he shot and missed Sewell, and the second time he shot and killed him."

Several other witnesses testified to substantially the same state of facts.

The defendant's account of the killing is as follows: That witness "got down to the big road about the time the wagons came along to the path leading from Pope's house down to the road; that the first thing he said was to Lee Sewell, and that he told him that he had run over him and his family as long as he could stand it; that he could stand no more of it, and that we [they] would settle it right then. The deceased replied that he wouldn't do anything, and the defendant replied that he was a liar; that at this time the deceased put his right hand behind him in the cotton and threw the lines down with which he was driving, and said, 'I'll kill you;' that as he said this defendant shot him; that he shot twice; that he did not know whether he missed him the first time or not; that when he put his hand behind him in the cotton he could not tell whether he got hold of anything or not; that after he shot the deceased he turned around and went back up to his brother Pope's house and from there on home; that he immediately went from his home on to Moulton and delivered himself up to the jail."

It was shown that deceased and his brother, Gus, and some of his companions had passed defendant's house on other occasions, the same day of the killing, and while passing had engaged

in the same kind of conduct, holloing and yelling. The defendant then offered to prove that deceased and his brother had passed defendant's house on other occasions, engaged in the same kind of conduct as on the day of the killing, and that defendant heard the holloing and knew of the conduct on the other occasions. The state objected, and the court sustained the objection and declined to allow any of the proffered testimony. The defendant also offered to prove that on the morning before the killing his wife, for the first time, had told him of improper and indecent conduct on the part of deceased toward defendant's niece, a young girl who lived at defendant's house. He also offered to prove that on the morning before the killing, the wife of defendant told him, for the first time, of a criminal assault or an attempted criminal assault on her by Gus Sewell, and that defendant had not seen, nor had the opportunity to see, deceased, or his brother Gus, after he received this information, until the time of the killing. The court declined to allow this proof, or any part of it, and the defendant excepted. The defendant also offered to prove the facts of the two assaults of which his wife had told him, but the court declined to allow the proof, and the defendant excepted. The trial court evidently declined to allow this proof upon the theory that there was no proof tending to show self-defense, and that there had been sufficient cooling time, and that mere words, as a provocation, can never reduce the degree of homicide below that of murder.

All the undisputed evidence showed that the defendant provoked the fatal difficulty.

We are of the opinion that the trial court properly limited the proof of the conduct of deceased in passing the defendant's house, i. e., the holloing, etc., to the day of the fatal difficulty. It was also proper to decline to allow proof by the defendant of the details of the assault, or alleged assault, by the deceased upon defendant's niece, and of the assault by Gus Sewell upon defendant's wife. But it was error to decline to allow proof of the fact that defendant was informed of such assaults on the morning before the killing, and that he had not had the opportunity to see deceased, after hearing of the assault, until the day of the killing. The trial court probably intended to follow the doctrine laid down by this court in *Roger's Case*, 117 Ala. 14, 22 South. 667, where it was said: "The facts that the deceased, a boy 16 years of age, carried the daughter of defendant, a girl of 13 or 14 years, from

[Warren v. The State.]

Gadsden to Ashville, three or four days before the homicide under a promise of marriage, but he did not marry her, and that, leaving her at Ashville, he returned to Gadsden two days before the shooting, can neither justify nor palliate the defendant's act in killing him, nor shed any legitimate light on the transaction. And this would be true even had his wrong been more aggravated—even had he debauched the girl, of which there is no pretense. In such case, if the mortal blow had been given by the father immediately upon hearing of the wrong to his daughter, and in the heat of passion engendered by the fact coming to his knowledge, all the facts would have been admissible to eliminate the element of malice from the act by referring it to passion which had not had time to cool, and thus reducing the homicide to manslaughter. But there is no pretense that the homicide was committed under these circumstances; to the contrary, it affirmatively appears that the defendant came to a knowledge of all the facts—as full knowledge as he had at the time he shot deceased—two days before the shooting occurred."

The decision in *Rogers' Case,* was explained in *Gafford's Case,* 122 Ala. 54, 25 South. 10; and such evidence, in proper cases, is held to be admissible for two purposes: One, to rebut malice; the other, in connection with self-defense, to show who was the aggressor. If the proffered evidence of this kind tends to show that the killing was the result of passion aroused by knowledge of a wrong to the defendant's family, his wife, or near relatives dependent upon him for protection, then it is admissible under the first theory; but if there be no evidence to show that the killing was induced by, or was the result of such passion, then it is not admissible to rebut malice.

In *Robinson's Case,* 108 Ala. 14, 18 South. 732, the defendant offered in evidence a letter found on the person of the deceased, written by a sister of defendant, which letter showed illicit relations between the sister and deceased. The letter was held not to be admissible, because the defendant, at the time he killed deceased, had no knowledge of the letter or its contents, and hence it could not have induced the passion, nor tended to rebut malice. It is said in that case that if by means of the letter knowledge of the illicit relation had, for the first time, come to the brother, and he had immediately, and in the heat of passion engendered by it, and before cooling time, killed the deceased, it might then rebut malice. In *Tally's Case,* 102 Ala. 34, 15 South.

722, the same doctrine is announced.  The true and correct rule in such cases, we hold, was declared in *Nettles' Case,* 58 Ala. 268, where the relation of the parties was the same as here.  It was there held (see sixth headnote) that:  "The fact that a niece of the deceased made a charge that the prisoner had insulted her, and that this was known to both parties, is competent on the trial of the prisoner for murder; but is not permissible to prove as a fact that such insult was given."

Our statutes have materially changed the rules of evidence in homicide cases, as was pointed out in *Fields' Case,* 47 Ala. 603, 606, 11 Am. Rep. 771, where it is said:  "By the common law, the jury determined merely the guilt or innocence of the prisoner; and, if their verdict was guilty, their duties were at an end.  They had nothing whatever to say as to the punishment to be inflicted. The court alone determined what the punishment should be, its extent and its severity; with that the jury had nothing to do. Their whole duty was discharged when the verdict of guilty was pronounced.  The common law, on this subject, has been greatly changed by our statutes, and the duties and responsibilities of juries largely increased; consequently evidence that would have been irrelevant and impertinent at the common law becomes proper and necessary, under our statutes, to enable juries to discharge their newly imposed duties rightly and properly."

"The degree of the crime must be determined by the verdict of a jury upon an examination of the testimony, and the punishment to be inflicted on the defendant rests in the discretion of the jury.  If the crime be murder in the first degree, the jury must determine whether the punishment shall be death, or imprisonment in the penitentiary for life.  If in the second degree, the defendant must be imprisoned in the penitentiary. * * * for not less than ten years, at the discretion of the jury.  Testimony is as necessary and important to enable the jury to exercise this discretion prudently and properly as to enable them to determine the guilt or innocence of the defendant.  The jury have two important duties to perform, and both are to be governed and controlled by the evidence, and neither can be wisely or rightly discharged without evidence.  As these duties are different, the evidence must necessarily be different.  After the guilt of the defendant is settled, the proper evidence, to determine the degree of his crime, and what should be the extent and severity of his punishment, must in great measure, depend upon a careful examination

of the circumstances, not those only immediately attending on the killing, but those also which may reasonably be supposed to have led to it; and these circumstances should be considered in connection with the good, or bad character, both of the defendant and the deceased."—47 Ala. 607, 11 Am. Rep. 771.

This language was quoted approvingly ·in *Bankhead's Case,* 124 Ala. 14, 19, 26 South. 979; but in a dictum in *Green's Case,* 143 Ala. 10, 39 South. 362, it was declared to be overruled by implication in a number of cases there cited. But on examination, it will be seen that the authorities cited as overruling *Field's Case* do not support the dictum, and take no account of *Bankhead's Case,* which was later than any cited, which follows it and quotes from it at length on this very point. Moreover, some of the cases cited support, instead of overruling it; and it does seem to be sound of necessity, if the statutes are to be followed, and the juries intelligently and righteously follow it. The writer of the dictum in *Green's Case* evidently wrote under the supposition that the *Field's Case* held that the bad character, alone, of the deceased might justify the taking of his life, which, of course, the case does not hold. The decision in *Field's Case, supra,* has been much reviewed. It is reported in 11 Am. Rep. 771, with notes. It is reviewed by Dr. Wharton, in his work on Homicide (section 617) and in the Central Law Journal, April 9, 1874. If the case could be said to hold that the character of deceased was admissible in all cases, in order to aid the jury in fixing the punishment, or that it is an excuse or palliation of a homicide in all cases to show that deceased was a bad man, then, of course, it is wrong and should be overruled. But such is not the holding in the case. It merely holds that, as our statute requires the jury in homicide cases to fix the degree of the crime, and the extent of the punishment for any degree found, the rules of admitting evidence ought to be different than at common law, when the jury had nothing to do with the punishment, when it was fixed with certainty by the law or by the court.

While there was no proffered evidence as to general bad character, or that deceased was tuburlent or bloodthirsty or quickly to be aroused, yet the proffered evidence should fall within the same rule touching admissibility as that of the character of deceased, or that of a threat by deceased. Dr. Wharton says that *Quesenberry's Case,* 3 Stew. & P. 308, is among the leading cases on the subject of such evidence. In that case, after holding that

the good or bad character of the deceased, as an abstract question, could have no bearing on the case; that to murder the vilest wretch is as much a crime as if he were the best, the most virtuous—the court said: "There can be no doubt but that; when the killing has been under such circumstances as to create a doubt as to the character of the offense committed, the general character of the accused may sometimes afford a clue by which the devious ways by which human action is influenced may be threaded and the truth attained."—3 Stew. & P. 315. "But, if the circumstances of the killing were such, as to leave any doubt whether he had not been more actuated by the principle of self-preservation than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motive by which he had been actuated. To this course we can see no good objection; and, it seems pretty certain that it would often shelter the innocent from the influence of that sound, but not unfrequently severe, maxim of the law that, when the killing has been proven, malice will be presumed, unless explained and rebutted. There can be but little danger of the guilty escaping, under the influence of a prejudice, created by such testimony, against the deceased. The discretion of the judge will be able to control and prevent such a result. And jurors will be able to comprehend the reason and object of such testimony."—3 Stew. & P. 316.

Is not this same principle and reasoning true where evidence may tend to show that the killing was induced by passion, and not by malice or premeditation? If the proffered evidence be true, the deceased had offered the grossest insult and outrage to a girl, a mere child, who was a member of defendant's family, and whom it was his duty, as well as his right, to protect or defend against such outrageous conduct; and a brother of deceased, who was shown to have acted jointly with deceased in offering insults to defendant and his family, by engaging in hooting, holloing, and jeering when passing defendant's house, had offered the very worst kind of an insult to, and assault upon, defendant's wife; and defendant had no knowledge of these insults until the morning before the killing, and had no opportunity to see the perpetrators of the wrong until the day of the killing, when the offenders again pass his house, and again, and in the presence of his wife, engage in holloing and yelling, to the annoyance of his family. If this be true, is it possible, or even probable, that defendant, who was then smarting under and worried by the offen-

sive news recently communicated to him by his wife, was actuated or controlled by passion, and acted in the heat of blood in pursuing deceased and provoking the fatal difficulty, rather than in malice or premeditation to take the life of deceased as a revenge for the wrong done his wife and niece? If he was thus actuated by revenge, rather than by passion, he would be guilty of murder in the first degree, notwithstanding the serious wrong theretofore done him by the deceased; but, if impelled to the acts by passion and heat of blood, and not in order to revenge the wrong, then he would not be guilty of murder in the first degree, but of murder in the second degree, and if sufficient cooling time had not elapsed, he would be guilty of manslaughter only. This proffered evidence, in connection with that allowed, might have been sufficient, in the minds of the jury, to reduce the degree at least to murder in the second degree, and therefore to reduce the punishment.

While proof of a motive is not necessary, and motive, like intend and malice, cannot be established by direct proof, because a matter of inference to be drawn by the jury from other attendant facts and circumstances, yet the relations existing between deceased and defendant prior to, and at the time of, the killing, in connection with other facts and circumstances, may disclose a motive, either of passion or of revenge, on the part of the defendant, which will aid the jury in identifying the wrongdoer or in ascertaining the degree of the crime.—*Hudson's Case,* 61 Ala. 333; *Hornsby's Case,* 94 Ala. 55, 10 South. 522. The presence or absence of motive, in homicide cases, is always a legitimate subject of inquiry.—*Clifton v. State,* 73 Ala. 473.

The evidence of the state and that of the defendant admitted tended to show that defendant was in a tower of rage when he overtook deceased and accosted him and his companions. The only motive or provocation attempted to be shown by the state was the fact that deceased and his companions were holloing and yelling as they passed defendant's house. This alone, of course, was not sufficient provocation to justify, or palliate the passion of defendant or the crime of murder. If the proffered evidence had been admitted, would it not at least have tended to palliate what was otherwise an inexcusable homicide? Would the defendant be guilty of the same degree of homicide or murder, and would he merit the same degree of punishment, if the proffered facts were true, as would be the case if they were false or never

existed? We think not. While the proffered facts may not constitute a part of the res gestæ of the killing, yet they are so connected with and related to the res gestæ as to explain or qualify them. The proffered evidence certainly tended to explain the defendant's following deceased and provoking the difficulty. See 6 Mayf. Dig. p. 351; Underhill, Crim. Ev. § 96; *Keiser v. Smith,* 71 Ala. 485, 46 Am. Rep. 342; *Maddox's Case,* 159 Ala. 55, 48 South. 689; *Terry v. Williams,* 148 Ala. 468, 41 South. 804; *Western Union Tel. Co. v. Manker,* 145 Ala. 418, 41 South. 850; *Louisville & N. R. Co. v. Stewart,* 128 Ala. 313, 29 South. 562.

If it should be conceded that this proffered evidence was not sufficient to show justification, as self-defense, nor to mitigate or reduce the offense of murder to that of manslaughter, still it was admissible for the consideration of the jury, in determining whether the killing was murder in the first or in the second degree. It is true that one who provokes a difficulty which results in a homicide cannot be excused or justified on the ground of self-defense, unless he retires, or offers to retire, in good faith, and is thereafter pressed or pursued by the deceased. It is also true that mere words, however offensive, will never serve to reduce the degree of the crime of homicide below that of murder. The law on this subject is well, and probably most fully, stated in *Sloane's Case,* 95 Ala. 24, 11 South. 15, where it is said: "We are of opinion that the words or conduct of another, under some circumstances, may be of such an insulting or provoking character as to kindle sudden passion, and provoke immediate resentment, even to the taking of life.—*Watson v. State,* 82 Ala. 12 [2 South. 455]. If the insult or provocation is of such a character as is reasonably calculated to kindle passion and provoke sudden resentment, and if the proof shows that the insult or provocation had this effect, and the homicide is traceable solely to the influence of passion kindled by the insult or provocation, then such killing is not willful, malicious, deliberate, and premeditated, and is not murder in the first degree, but murder in the second degree. Mere words, however offensive, cannot reduce the offense to manslaughter. On the other hand, the extent and character of the insult or provocation offered, considered in connection with the state of feeling between the parties, and other attending circumstances, may be such as to justify the conclusion that the words or conduct of the deceased were seized upon as a pretext to execute a previously formed design to take life. Although the design

to take life may have been executed instantly after being formed, if it proceeded from willfulness, malice, deliberation, and premeditation, the offense would be murder in the first degree.—*Hornsby v. State,* 94 Ala. 55, 10 South. 522. The degree of the offense— that is, whether the fatal shot was the result of giving way to sudden passion, reasonably excited, and in resentment of the insult or provocation, or in execution of a formed design, as explained and qualified—is a question of fact to be determined by the jury from all the circumstances in the case."

There was evidence in this case tending to show that the defendant was in a passion and rage of anger when he killed the deceased; in fact, all of it has such tendency. It may be that defendant had no sufficient justification or provocation for his anger to wholly excuse him for the taking of the life of one who, as he conceived, had aroused or provoked his anger; but if the evidence was true—and its truth was for the jury, in connection with the other evidence—it was proper for the jury to consider it in determining whether or not the severest, or a lesser, punishment should be inflicted; to say whether the offense was murder in the first or the second degree. If the proffered evidence be true, it certainly would tend to arouse and inflame the anger and passion of any man; and then for the person who had given the offense to hoot and jeer as he was passing the home which he had offended and insulted would certainly be calculated to fan the slumbering coals of anger into a flame of passion and ire.

It was certainly competent for the jury to inquire as to what caused defendant's anger and fanned it into a passion of rage. There was surely some motive which caused defendant to suddenly leave his work, near his home, and follow deceased and shoot him. Was it merely the fact that deceased and others had dared to hoot and hollo and jeer as they were passing his house? This was the theory and contention of the state. If this be all, then it was no excuse, justification, or mitigation. But if this offense was offered by one who had deliberately insulted and offended a child who was a member of the defendant's family, the right and duty to protect whom devolved on the defendant, and was offered while the deceased was in company with one who had given a like offense to defendant's wife, and defendant had only recently heard of these insults, then these parties, in so passing the defendant's home, where the objects of their wrongs and of the defendant's affection resided, hooting and jeering in renewed

disrespect, unquestionably afforded more provocation for the anger, wrath, or passion of defendant than would otherwise appear from such latest offense. Surely a man does not merit the same punishment for killing one who has offended against him and against his home, as the proffered testimony in this case tended to show was the relation between deceased and defendant, as he does for killing an unoffending person, by poison or lying in wait, or with deliberation and premeditation, or with robbery or other felonious purpose as the motive.

The evidence allowed shows that defendant was acting under great passion and was in a tower of rage. The state's own witnesses show this. The witness Jackson says he asked defendant, "Mr. Warren, what in the world do you mean?" The answer was, "I have taken all off the G—— d—— rascal that I intend to take." When defendant overtook the wagons in the road, the first thing he said was to deceased—to quote: "The first thing he said was to Lee Sewell, and then he told him that he had run over him and his family as long as he could stand it, that he could stand no more of it, and that he would settle it right then."

The state having shown this, ought not the defendant to have been allowed to give the proffered evidence? It would not be a justification—no, not at all; but it was certainly admissible in mitigation of punishment, and to show whether the killing was murder in the first or the second degree.

It may be that there was no testimony admitted in this case, and therefore none before the jury, which would authorize or warrant a verdict of acquittal of lesser degree of crime than murder in the second degree, and consequently there was no error in the court's declining to instruct or charge the jury as to the law of self-defense, or of manslaughter in either degree, and therefore we will not reverse for the failure to so charge in this case; but, as we are reversing for failure to allow other proof, we do not decide this question.—*Gafford's Case,* 122 Ala. 54, 25 South. 10; *Robinson's Case,* 155 Ala. 67, 45 South. 916; *Montgomery v. State,* 160 Ala. 7, 49 South. 902; *Dabney's Case,* 113 Ala. 38, 42, 21 South. 211, 59 Am. St. Rep. 92; *Stallworth's Case,* 146 Ala. 15, 41 South. 184.

While it is not reversible error for the trial court to fail or decline to instruct the jury as to manslaughter when there is no tendency in the evidence to justify a verdict therefor, yet it is the safer and better practice to instruct the jury as to manslaughter

[Warren v. The State.]

in homicide cases. We can do no better here than to repeat what we have often said, and to emphasize it if possible: "The practice, and we doubt the wisdom of departure from it, has been for the judge to instruct the jury as to every degree of homicide of which there may be a conviction under the indictment. * * * The refusal of abstract instructions is never erroneous. There must, however, be an absence of all evidence having a tendency to reduce the offense to manslaughter; and it is a grave responsibility the judge assumes in the refusal of such instructions, a responsibility which ought to be assumed only in plain cases. It is an imperative duty, when the indictment comprehends every degree of criminal homicide, if a conviction of murder is sought, for the judge to instruct the jury as to the characteristics and constituents of murder in each of its degrees, leaving them free to determine of which degree. if either, there is guilt; less than this will not satisfy the statute."—*Brown v. State,* 109 Ala. 80, 20 South. 106.

" 'The province of the court and jury are distinctly marked, and neither can lawfully invade the other.'—*Dennis v. State,* 112 Ala. 64, 20 South. 925. The following quotation from the above-cited case of *Dennis v. State* * * * is, in our opinion, appropriate here: 'Because of the difficulty which sometimes arises to distinguish between the most aggravated cases of manslaughter in the first degree and the mildest type of murder in the second degree, it has been declared "that it is much the safer rule to charge upon all the degrees of homicide included in the indictment when the party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree." ' "—*Reeves v. State,* 186 Ala. 21, 22, 65 South. 162.

The trial court, however, did not instruct the jury fully as to any degree of murder except that in the first degree. He did instruct them fully, and we hold, correctly, as to murder in the first degree. While there are certain excerpts from the charge, which, as pointed out by counsel for appellant, may not be correct standing alone, yet, construing the charge as a whole and in connection with the written charges given, the oral charge is cured of all misleading tendencies.

It is insisted that there was error in the giving of the state's requested charge 2, as to murder in the first degree, which reads as follows: "I charge you gentlemen of the jury that if you

believe from the evidence in this case beyond a reasonable doubt that the defendant took the life of Lee Sewell willfully or intentionally and maliciously, after deliberation and premeditation, then he would be guilty of murder in the first degree, and it would be your duty to render a verdict finding him guilty of murder in the first degree."

It is insisted that the use of the words "after," instead of the word "with," renders the charge bad; that it is misleading, in that it would authorize a conviction of murder in the first degree if defendant, at any time prior to the killing, however remote, deliberated or premeditated the killing; even though he had abandoned the purpose and, at the actual time of the killing, was acting without deliberation or premeditation. If it possessed such misleading tendencies, the charge was cured thereof by defendant's given requested charges. The trial court, however, should have instructed the jury as to the elements of murder in the second degree, as well as in the first degree. It is true that the court did instruct them as to the form of the verdict in case they refused or failed to find the defendant guilty of murder in the first degree, and also instructed them that if they failed to find for murder in the first degree, then they should find the defendant guilty of murder in the second degree; but in no part of the charge did the court instruct the jury as to the elements of murder in the second degree, nor as to the difference between the two degrees. The statute is imperative as to both degrees; and the charge of the court, as a whole, invaded the province of the jury as to fixing the degree of murder. While it did not deny the right of the jury to return a verdict as for murder in the second degree, yet it was evident to the jury that the court expected, if it did not request, a verdict of guilty in the first degree.

In *Brown's Case,* 109 Ala. 80, 20 South. 103, the law on this subject is made plain. The duty is decided to be imperative to charge the jury as to the characteristics and constituent elements of murder in each of its degrees, thus leaving the jury free and able to determine of which degree, if of either, there is guilt. "Less than this will not satisfy the statute." The charge, though not in words, did, in legal effect, exclude from the jury the consideration of murder in the second degree.

ANDERSON, C. J.—(1-3) The majority are not in accord with Justice MAYFIELD in putting the trial court in error upon

[Jackson v. Roanoke Banking Co.]

the points discussed in his opinion. "It is a principle, many times announced by this court, that, in cases of homicide, the law presumes malice from the use of a deadly weapon, and casts on the defendant the onus of repelling the presumption, unless the evidence which proves the killing shows also that it was perpetrated without malice.—*Hadley v. State,* 55 Ala. 31; *Murphy v. State,* 37 Ala. 142. And whenever malice is shown, and is unrebutted by circumstances of the killing, or by other facts in evidence, there can be no conviction for any less degree of homicide than murder.—Clark's Man. Cr. Law, § 469."—*Roberts v. State,* 68 Ala. 156.

The evidence in this case showing that the defendant killed the deceased with a deadly weapon, and neither the attending circumstances nor the rebuttal evidence of the defendant showing anything to the contrary, either directly or inferentially, the trial court did not err in giving the general charge, requested by the state, with the hypothesis that if the jury believe the evidence beyond a reasonable doubt, they should find the defendant guilty of murder.—*Parrish v. State,* 139 Ala. 16, 36 South. 1012.

(4). We think that the action of the trial court in excluding the statements and acts of the deceased and associates, which were communicated to the defendant before the killing, was justified by the case of *Rogers v. State,* 117 Ala. 9, 22 South. 666.

(5) Whether or not the trial court did or did not sufficiently define murder in the second degree in the oral charge matters not, as there was no objection or exception to the action of the court in this respect.—*McPherson v. State,* 198 Ala. 73 South. 387.

The majority are of the opinion that this case should be affirmed; and it is so ordered.

SAYRE, J., not sitting.